[No. H013548. Sixth Dist. Feb. 6, 1997.]

WILLIAM REICHARDT et al., Plaintiffs and Respondents, v.
GEORGE HOFFMAN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B.2. through B.5., C. and D.

## COUNSEL

C. Michael McClure, Jackson, Tufts, Cole & Black, Gerald Z. Marer and Amy E. Margolin for Defendant and Appellant.

Joel Franklin, Spiering, Swartz & Kennedy and Andrew H. Swartz for Plaintiffs and Respondents.

## OPINION

MIHARA, J.—Plaintiffs own a house in Monterey County adjacent to a vacant lot owned by defendant. Defendant's lot is benefited by a deeded nonexclusive easement over plaintiffs' property for access purposes. Plaintiffs are required to keep the easement "clear" in order to ensure "proper access" for defendant. After years of dispute about the easement, plaintiffs obtained a judgment extinguishing defendant's easement, enjoining defendant from interfering with plaintiffs' enjoyment of their property and awarding plaintiffs compensatory and punitive damages based on causes of action for nuisance, violation of conditions, covenants and restrictions (hereafter CC&R's) applicable to defendant's property and interference with contract or prospective economic advantage. Defendant's appeal challenges the sufficiency of the evidence to support (1) the extinguishment of his easement, (2) the court's finding that he was liable to plaintiffs for interference with contract or prospective economic advantage, (3) nuisance liability, (4) damages for violation of the CC&R's and (5) damages for emotional distress.

Defendant also claims that the punitive damages award was improper because plaintiffs failed to adduce evidence of his financial condition. Finally, defendant claims that the judgment must be reversed because the trial court conducted a "view" of the property while court was not in session without notifying the parties. We conclude that the evidence does not support the trial court's extinguishment of defendant's easement. Accordingly, we modify the judgment by striking the order extinguishing defendant's easement and affirm the modified judgment.

FACTS

In 1977, defendant paid $21,000 for a one-acre lot adjacent to the property now owned by plaintiffs. Plaintiffs' property already had a home on it at that time. The only use that defendant has ever made of his vacant lot has been as a place to store old trucks, a boat and other debris including roofing tile, beams, concrete blocks and fragments, a cement mixer, saw horses and lumber. Defendant's neighbors and the health department asked him to remove this debris, but he did not respond to these requests. Defendant kept a nonfunctional pickup truck on his lot for a decade even though he was cited in both 1987 and 1989 by the Monterey County Department of Health for storing this vehicle on his property and directed to remove this "health and safety" hazard immediately. In 1989, defendant was cited by the California Department of Forestry for maintaining a fire hazard on his lot. Defendant has also been cited for illegally grading his lot without a permit. Less than a month before trial, defendant removed the nonfunctional pickup truck from his lot.

Defendant's grant deed states that he has a "non-exclusive easement for driveway purposes" over a strip of land 25 feet wide and 80 feet long across the front of plaintiffs' property. Defendant's lot is not landlocked. It fronts on a public street. The front porch of plaintiffs' home encroaches a few feet into defendant's easement. Defendant became aware of this encroachment in the 1970's. In 1980, a variance was granted to previous owners of plaintiffs' property which permitted the house to violate the setback requirement[1] on the condition that "the right-of-way be kept clear to provide proper access" to defendant's lot.

Plaintiffs purchased their property in June 1987. In August 1987, defendant first encountered plaintiffs when he found vehicles parked in the easement blocking his access to his lot on the day of plaintiffs' wedding. He knocked on plaintiffs' door, complained about the cars parked in front of

---

[1]The setback requirement specified that the structure be set back 30 feet from the easement. In fact, the front porch of the house actually encroached a few feet on the easement.

plaintiffs' house and told plaintiff Judith Reichardt (hereafter Judith) that "they weren't supposed to park" in the easement. Judith had just gotten out of the shower and was wet and in her robe. She explained that this was their wedding day, and they were going to have a number of guests. She asked defendant if he was going to require access to his property again that day. Defendant told her "it doesn't matter whether I will be back later today or not. No cars are ever to be parked there." Defendant insisted upon talking to "the groom," but he was not permitted to do so.

Through the years, defendant has consistently insisted that no cars are allowed to park anywhere in the easement area. He claims that there is not adequate room for a vehicle to pass if another vehicle is parked in the easement. However, he concedes that the easement area is at least 20 feet wide. Everyone other than defendant has concluded that there is plenty of room for two cars to pass one another in the easement area. A few days after the August 1987 encounter, while plaintiffs were away on their honeymoon, defendant returned and removed much of the vegetation and part of a tree that were growing on plaintiffs' property along the edge of the easement. He did not contact plaintiffs before doing so. Plaintiffs' friend, who was house-sitting for them while they were away, saw defendant doing this and asked defendant to stop, but defendant refused. Defendant's mutilation of this vegetation left a "mud wall" bare of vegetation in front of plaintiffs' house. The tree later died, and the vegetation never grew back.

In late 1987, plaintiff William Reichardt (hereafter William) first met defendant. Defendant told William that "this was his easement and we were to treat that easement area, the paved area, as if it were a street with no parking signs on it . . . ." William asked defendant if it would be advantageous for defendant to have direct access to his property from the street. Defendant asked whether William had $50,000 "to contribute to the possibility of putting in a new driveway." William replied that he did not. Around Christmas of 1987, defendant pounded on plaintiffs' front door very early on a Saturday morning and demanded that a car parked on the easement be moved. William moved the car so that defendant could get by, but he did not move the car off the easement. Defendant became irate and demanded that the car be removed entirely from the easement area. William did so, but defendant insisted that the car was still on the easement and became even more angry. He said "you just can't park in front [of your house] at all. This is my easement, you are never to park on it." William removed his car from the front of his house. William had a similar encounter with defendant in March 1988. These incidents were "ongoing" through early 1991 although William could not remember the dates of any other specific incidents.

Plaintiffs had not been apprised of the existence of defendant's easement when they purchased their property. After learning of its existence, they

made a claim against their title insurer, the seller and the seller's real estate agent. This claim was settled in 1990. In 1991, plaintiffs tried to contact defendant in an attempt to convince him to sell them his easement. In May 1991, defendant told them that he had received their communications and "he was sure we could work something out." A month later, defendant told them that he "was still thinking about it" but "had been too busy to get to it." In the fall of 1991, Judith met with defendant and showed him plans that plaintiffs had had prepared for an alternative driveway access for defendant's property. Defendant orally agreed to accept a sum of money to cover the cost of an alternative driveway in exchange for giving up his easement. Based on this apparent agreement, Judith expended $1,750 for plans for the alternate driveway. However, defendant never agreed to a specific sum nor did he ever sign a written agreement to exchange his easement for a sum of money.

Plaintiffs moved to Oregon in January 1992 and rented out their property. In February 1992, Judith traveled to Monterey for the sole purpose of finalizing her agreement with defendant regarding the easement. The alternative driveway was estimated to cost about $23,000 so Judith borrowed $30,000 and placed this sum in escrow for defendant. After defendant failed to close the escrow, Judith contacted him and asked why he had not completed the transaction. Defendant said "what's it worth to you." The transaction was never completed, and this was the last contact Judith had with defendant.

Defendant subsequently had heated encounters with plaintiffs' tenants in which he demanded that they move vehicles parked in the easement area. He also took a photograph of one of these tenants as he went to move his vehicle in his bathrobe. Defendant even called the police about one of plaintiffs' tenants on one occasion. When plaintiffs listed their property for sale, defendant attended several open houses held at plaintiffs' property. Defendant parked his truck with a garbage can in the back of it along the property line between his lot and plaintiffs' property. He took a camera with him, handed out fliers, posted a sign and wrote down the license numbers of the vehicles parked outside plaintiffs' home during these open houses. The sign and fliers said "take notice that there exists a recorded driveway easement . . . [which] might be subject to vehicular traffic at any time day or night seven days a week, 24 hours a day." Defendant also spoke with potential purchasers and potential renters attending these open houses. Plaintiffs' real estate agent observed this conduct and concluded that defendant was "intimidating potential tenants or buyers." The agent herself felt intimidated by defendant.

Eventually, in October 1993, plaintiffs received an offer to purchase their property from Mark Porter. At this point, plaintiffs were in serious financial

difficulty and needed to sell their property to alleviate this financial crisis. "Our whole lives were occupied with trying to sell that house." Porter's offer was contingent on Porter meeting with defendant to discuss the possibility of removing the easement.[2] Porter contacted defendant to discuss the easement. He hoped that he would be able to "establish a comfort level" with defendant by either putting in an alternative driveway for defendant or "somehow working things out with the two owners . . . ." They arranged a meeting. Defendant was aware at this time that plaintiffs were experiencing serious financial difficulties and were desperate to sell their property and that Porter had offered to buy the property. Defendant met with Porter at the property. When defendant arrived at the property, defendant immediately became upset when he discovered that one of plaintiffs' tenants' guests had parked his car in the easement area. Defendant parked his truck so that the guest could not drive his vehicle away while defendant met with Porter. Porter observed this encounter.

Porter then spoke with defendant. Defendant told Porter that his easement "was the entire front yard" of plaintiffs' property. He said that plaintiffs' front porch was "the first thing that's going to be torn off there the minute you buy the place." Porter told defendant that he hoped that they "could sit down and somehow work out a situation where we can be comfortable living next to you and sharing this easement or possibly just putting [in] a new driveway." Porter mentioned that he had children and a dog and he hoped to possibly put a dog run in front of the house. Defendant said, "there will be nothing in the easement. If there is anything in the easement I will run it over." Porter asked if he meant children, and defendant said "anything." Defendant refused to even discuss an alternative driveway unless Porter had "eighty to a hundred thousand dollars" to contribute.

Defendant also told Porter that Porter was paying too much for plaintiffs' property and that plaintiffs' house had "several structural problems." Defendant informed Porter that plaintiffs had received $100,000 in compensation in their action involving their lack of notice of the easement. Defendant said that "it was his money, not their money, it was his money. And that's why he has been fighting them for all these years because he felt all along it was his money." Porter decided not to buy plaintiffs' property because defendant "is a complete basket case" and "I can't even reason with him." "[T]he biggest thing is the fact that he mentioned that he would run over our kids or anything that was in the driveway, dogs, kids, bikes, anything." "I couldn't live next to a man like that. He was too off the wall. I really felt very threatened."

---

[2] Porter had a less than accurate understanding of the nature of the easement. He believed that the fact that the easement was nonexclusive meant that there were two physical halves of the easement, one half belonging to defendant and the other half to plaintiffs.

After Porter decided not to purchase the property, plaintiffs' real estate agent concluded that the property was unmarketable because defendant intimidated people and interfered with attempts to market the property. Plaintiffs received no other viable offers to purchase their property. Had Porter completed the purchase, plaintiffs would have realized a net gain of $88,000. The loss of this potential sale was a "devastating" blow to plaintiffs because it left them with "no money," and a negative cash flow which placed them "up against the wall." William "collapsed in tears" and "[i]t was very difficult" for him to deal with this situation. Judith's emotional condition was also detrimentally affected. "It kind of meant the end for us."

Plaintiffs filed an action against defendant in November 1993 seeking to extinguish his easement, obtain declaratory and injunctive relief and obtain compensatory and punitive damages for interference with contract or prospective economic advantage, nuisance and violation of the CC&R's. After a court trial, the court issued a judgment extinguishing defendant's easement, enjoining him from interfering with plaintiffs' property and from violating a number of the CC&R's and awarding plaintiffs $150,000 in compensatory damages and $50,000 in punitive damages. The trial court issued an extensive statement of decision in support of its judgment.

The court made the following findings. The court concluded that defendant had created a nuisance and violated the CC&R's. His conduct prevented plaintiffs from having "free use" of their property and interfered with their "comfortable enjoyment" of their property. Defendant's easement was "subject to" the CC&R's. The various citations that defendant had received as a result of his use of his lot violated the CC&R's. Defendant's demands that the easement be kept "completely clear" for his "exclusive use" were reflective of his belief that the easement was his exclusive property and his conduct was consistent with this belief. However, the easement area was wide enough to allow defendant access to his property even with another vehicle parked in the easement area. The agreement that the easement would "be kept clear to provide proper access" did not convert the easement from a nonexclusive one to an exclusive easement. The purpose of this agreement was simply to ensure that defendant had "adequate passage" to his property. Defendant's conduct in connection with the easement was "incompatible with both the nature and exercise" of the easement. By treating the easement as exclusive, defendant had "surcharg[ed] the non-exclusive nature of it" and used the easement to "harass and intimidate" plaintiffs and their guests. Defendant's conduct prevented plaintiffs from "making any use" of the easement. Defendant had "harassed and frightened" plaintiffs' tenants and their real estate agent in connection with the easement, and his conduct had caused Porter to decide not to purchase plaintiffs' property.

Since reasonable access to defendant's property could be obtained from the public street adjoining the lot rather than by way of the easement, the court concluded that it was appropriate to extinguish defendant's easement. The court awarded $88,000 in damages for defendant's interference with plaintiffs' economic relationship with Porter, $22,000 for defendant's creation of a nuisance and violation of the CC&R's and $40,000 for plaintiffs' emotional distress arising from defendant's interference, his creation of a nuisance and his violation of the CC&R's. In addition, the court awarded $50,000 in punitive damages based on defendant's conduct in connection with the Porter offer. Defendant's motion for a new trial was denied, and he filed a timely notice of appeal.

## DISCUSSION

### A. New Issues Raised in Reply Brief

In his reply brief, defendant makes a number of new contentions which he acknowledges he did not raise in his opening brief. Taken as a whole, defendant's reply brief reads like an entirely new opening brief rather than as a response to plaintiffs' brief.[3] The parties disagree as to exactly how many of the issues raised in the reply brief are "new," but even defendant concedes that at least five issues are "new." Plaintiffs claim that there are 16 new issues. The truth is somewhere in between.

Defendant's opening brief raised seven issues. His reply brief appears to raise approximately 20 issues. Defendant concedes that his assertion that "the entire judgment is infected by the lower court's consideration of constitutionally impermissible factors and must be reversed" is an entirely new issue which was not raised in his opening brief. Since defendant's opening brief simply challenged the sufficiency of the evidence to support (1) the extinguishment of defendant's easement, (2) liability for interference with contract or prospective economic advantage, (3) nuisance liability, (4) damages for violation of the CC&R's and (5) emotional distress damages, defendant's other challenges to the court's liability findings and compensatory damage awards are "new" issues raised for the first time in his reply brief. Defendant's reply brief challenge to the sufficiency of the evidence to support an award of punitive damages is also new because his only challenge

---

[3]Defendant's opening brief is only 39 pages long including 17 pages of facts and no footnotes. In contrast, his reply brief is 50 pages long including less than 9 pages of facts. The reply brief contains 48 footnotes and each page of his reply brief contains more than 10 percent more text than the pages of his opening brief. While plaintiffs' brief was similarly lengthy at 54 pages and had 28 footnotes, plaintiffs' brief included 17 pages of facts. In all, defendant's reply brief contains about twice as much appellate argument as his opening brief.

to this award in his opening brief was on the ground that it was invalid because plaintiffs had failed to introduce evidence of his financial condition.

The many new issues raised by defendant in his reply brief are not merely elaboration of issues raised in his opening brief or rebuttals to plaintiffs' briefing. For instance, defendant's reply brief assertion that the court erred in awarding *both* an injunction and damages for violation of the CC&Rs was never even suggested in his opening brief. Defendant's reply brief challenge to the excessiveness of the compensatory damages award is also new. In his opening brief, defendant challenged the *emotional distress award* as unsupported by the evidence, and he claimed that the CC&R violations did not cause plaintiffs any damage, but he did not pose a challenge to the excessiveness of the compensatory damages award as a whole. Similarly, defendant's reply brief challenge to the propriety of a *separate award* for emotional distress is also new because his opening brief challenge was simply to the sufficiency of the evidence to support any damages for emotional distress.

We refuse to consider the new issues raised by defendant in his reply brief. ■ "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc.* v. *Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432].) "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [142 Cal.Rptr. 429, 572 P.2d 43].) " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

The California Supreme Court long ago expressed its hostility to the practice of raising new issues in an appellate reply brief. "Some additional points are made for the first time in their closing brief. We are not disposed to look with favor upon a point so made, unless good reason appears for the failure to make it in the opening brief. This practice is not fair to a respondent, and tends to delay the final disposition of appeals. This court has heretofore said, that while it is undoubtedly at liberty to decide a case upon any points that its proper disposition may seem to require, whether taken by counsel or not, an appellant *should, under the rules, make the points on*

which he relies in his opening brief, and not reserve them for his reply, and that the court may properly consider them as waived unless so made. [Citations.] This should undoubtedly be the rule where no good reason appears for the omission to make the point in the opening brief, and it does not appear that the appellant would be unjustly affected by a refusal to consider it." (*Hibernia Sav. and Loan Soc.* v. *Farnham* (1908) 153 Cal. 578, 584 [96 P. 9].) "We do not mean to say that an appellant might not be allowed in exceptional cases to discuss new questions in his final brief. He might be allowed to do so upon an application showing meritorious reasons why the points were not made in the opening brief. Such application might be based upon sickness, inadvertence, or other excusable neglect. But in the case at bar no reason whatever is given for this departure from the ordinary method of presenting a case in this court. If the practice were allowed without any substantial reason, it would lead to great irregularity and delay. In such event the respondent, of course, could justly demand the right to file an additional brief, and the course of the argument by brief would be radically changed." (*Kahn* v. *Wilson* (1898) 120 Cal. 643, 644 [53 P. 24].)

■ Defendant filed his opening brief in October 1995. Plaintiffs filed their brief in March 1996. Defendant filed his reply brief on June 10, 1996. On June 21, 1996, plaintiffs filed a motion to strike defendant's reply brief or portions thereof. On June 27, 1996, defendant filed a reply to plaintiffs' motion in which he claimed that there was no impropriety in raising new issues in the reply brief since the appellate court "may and should" address these issues. Defendant made no showing of good cause in his reply to plaintiffs' motion. Plaintiffs responded to this reply by arguing that defendant was "abusing the appellate process" and noting that "it would be oppressive and burdensome" for plaintiffs to have to respond to what amounted to essentially a new opening brief.

Defendant filed an eight-page response to plaintiff's response to his reply to their motion. In this response, defendant for the first time attempted to demonstrate good cause for his failure to raise the new issues earlier. He stated that he had retained a new attorney after the opening brief had already been prepared and filed. This new attorney substituted in on December 5, 1995. Because the new attorney was allegedly busy familiarizing himself with the trial record and doing legal research, he was not able to take any action in this case before the filing of plaintiffs' brief in March 1996. This statement constitutes defendant's entire justification for his failure to raise these new issues prior to June 1996. In their reply to this statement, plaintiffs pointed out that they had limited means and "should not be saddled with the onerous burden of having to file additional briefing simply because Appellant retained new counsel after filing the Opening Brief." Plaintiffs asserted

that "they should not be required to continually increase the resources devoted to defending this appeal every time Appellant briefs this matter."

We agree with plaintiffs that fairness supports their challenge to defendant's assertion that he has the right to continue to raise new issues in a reply brief filed eight months after his opening brief, six months after he obtained new counsel and three months after plaintiffs filed their brief. Defendant has singularly failed to demonstrate good cause for his failure to brief these issues earlier. Defendant, as the appealing party, had the opportunity to frame the issues in this appeal at the time he filed his opening brief. If he was dissatisfied with his counsel at that time, he should have sought an extension of time so that he could obtain new counsel prior to the filing of the opening brief. In addition, we are skeptical of defendant's counsel's claim that the three-and-a-half-month period between his substitution in as defendant's attorney and the filing of plaintiffs' brief did not permit him enough time to review the record and the opening brief and discover that new issues would need to be addressed. The record in this case is not voluminous and the opening brief was not particularly lengthy. Had defendant's new counsel sought permission to file a supplemental opening brief in December or January, he might have been able to demonstrate good cause therefor. The mere fact that an appellant chooses to obtain new counsel two months after filing his opening brief cannot justify his contention that it is proper to raise new issues in a reply brief filed six months later. We refuse to consider the issues raised by defendant in his reply brief which were not raised in his opening brief.

## B. *Sufficiency of the Evidence*

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], italics in original; accord, *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) " '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740], quoting *Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].) Our role is limited to determining whether the evidence before the trier of fact supports its findings. (*Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 123 [10 Cal.Rptr.2d 55].)

### 1. *Extinguishment of the Easement*

■ Defendant challenges the sufficiency of the evidence to support the trial court's extinguishment of his easement. He claims that his conduct was not "incompatible" with the "nature or exercise" of his easement. We conclude that the trial court's extinguishment of defendant's easement cannot be upheld.

"The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement." (Civ. Code, § 803.) In this case, defendant's land was the dominant tenement and plaintiffs' land was the servient tenement. "The extent of a servitude is determined by the terms of the grant . . . ." (Civ. Code, § 806.) The extent of the servitude benefiting defendant's land was described in the grant deed by which defendant obtained title as a "non-exclusive easement for driveway purposes." ■ When an easement is "non-exclusive," the common users must accommodate each other. (*Scruby* v. *Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 703 [43 Cal.Rptr.2d 810].) "[T]he owner of a dominant tenement must use his easement and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Baker* v. *Pierce* (1950) 100 Cal.App.2d 224, 226 [223 P.2d 286].) The owner of the servient tenement may use the burdened land in any way which does not "interfere unreasonably" with the easement. (*Camp Meeker Water System, Inc.* v. *Public Utilities Com.* (1990) 51 Cal.3d 845, 867 [274 Cal.Rptr. 678, 799 P.2d 758].)

■ Extinguishment of an easement is an extreme and powerful remedy which is utilized only when use of the easement has been rendered essentially *impossible.* "A servitude is extinguished . . . [b]y the performance of any act upon either tenement, by the owner of the servitude, or with his assent, which is incompatible with its nature or exercise." (Civ. Code, § 811.) The California Supreme Court construed this statute more than a century ago as authorizing extinguishment of an easement only where the easement owner performs or authorizes an act which *permanently prevents* use of the easement. "This seems to be a recognition and statutory declaration of the rule . . . that if the owner of a dominant estate do acts thereon which *permanently prevent* his enjoying an easement, the same is extinguished, or if he authorize the owner of the servient estate to do upon the same that which prevents the dominant estate from any longer enjoying the easement, the effect will be to extinguish it." (*Lux* v. *Haggin* (1886) 69 Cal. 255, 292-293 [10 P. 674], italics added.) "The courts have interpreted this incompatibility as necessitating a *permanent interference* or an act of a nature such that thereafter exercise of the easement cannot be made without

*severe* burden upon the servient tenement." (*Buechner* v. *Jonas* (1964) 228 Cal.App.2d 127, 132 [39 Cal.Rptr. 298], italics added.)

We have not located any case in which an easement was extinguished in the absence of evidence that the owner of the dominant tenement had performed or authorized an act which resulted in a *physical change* which prevented continued use of the easement without imposing a severe burden on the servient tenement. (*Buechner* v. *Jonas, supra,* 228 Cal.App.2d 127 [planting and maintenance of hedge across easement did not merit extinguishment of easement]; *McCarty* v. *Walton* (1963) 212 Cal.App.2d 39, 45 [27 Cal.Rptr. 792] [building of rock wall with gate in it did not merit extinguishment of easement]; *Crimmins* v. *Gould* (1957) 149 Cal.App.2d 383, 390 [308 P.2d 786] [easement owner's dedication of land for construction of public street leading to easement causing the easement to be used by the general public did justify extinguishment of the easement].) In order to justify extinguishment of an easement, "[t]he acts of the owner of the dominant tenement . . . must be of a character so decisive and conclusive as to indicate a clear intent to abandon the easement." (*Smith* v. *Worn* (1892) 93 Cal. 206, 213 [28 P. 944].) The interference with use of the easement must be material and permanent rather than occasional and temporary in order to justify extinguishment. (*People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 418 [196 P.2d 570, 6 A.L.R.2d 1179].)

The record does not contain any evidence of a physical change which created a *permanent* and material interference which was *incompatible* with use of the easement. The trial court found that defendant's *conduct* in connection with the easement was "incompatible with both the nature and exercise" of the easement because, by treating the easement as exclusive, defendant had "surcharg[ed] the non-exclusive nature of it" and used the easement to "harass and intimidate" plaintiffs and their guests. The court concluded that defendant's conduct prevented *plaintiffs* from "making any use" of the easement area.

However, the critical question in determining whether extinguishment of defendant's easement was justified was whether defendant had performed or authorized an act which permanently and materially interfered with *his* continued use of the easement. The absence of any physical change was indicative of an absence of justification for extinguishment. While defendant's outrageous *conduct* prevented *plaintiffs* from making reasonable use of the easement area, such conduct simply cannot justify extinguishment of the easement. Preventing plaintiffs from using the easement area *did not prevent defendant* from using the easement. If anything, defendant's threatening conduct probably facilitated defendant's use of his easement. While plaintiffs were legally entitled to make reasonable use of their land even though it

was burdened by defendant's easement, and defendant's unjustified interference with plaintiff's use of their land was a legal nuisance, this conduct could not justify extinguishing defendant's easement under Civil Code section 811 because the easement could only be extinguished if defendant's conduct interfered with his own use of the easement.

There was no evidence that defendant's actions in connection with the easement materially or permanently prevented defendant from using the easement "without *severe* burden" on plaintiffs. While defendant's insistence that he had the right to exclusive use of the easement area was unwarranted and incorrect, his assertions did not result in any physical change which permanently burdened defendant's use of the easement and prevented its continued use. Evidence that defendant had threatened to run over anything in the easement area including children and animals also did not support the court's extinguishment of the easement. This threat did not *permanently* prevent defendant from using the easement or establish that defendant's continued use of the easement would put a *permanent and severe burden* on the servient tenement. An injunction requiring defendant to accommodate the servient tenement's use of the easement area would have been the appropriate remedy to eliminate the basis for such threats.

In the absence of evidence that defendant performed or authorized some act which resulted in a physical change that permanently and materially prevented defendant from using the easement or made his use of the easement severely burdensome on the servient tenement, the trial court was not authorized under Civil Code section 811 to extinguish defendant's easement. As the record contains no evidence of such an act, the extinguishment of defendant's easement cannot be upheld and must be stricken from the judgment.

2.-5.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

CONCLUSION

The trial court's order extinguishing defendant's easement is hereby stricken, and the trial court is ordered to modify the judgment to so

*See footnote, *ante*, page 754.

reflect. As so modified, the judgment is affirmed. Plaintiffs shall recover their costs.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied March 5, 1997, and the opinion was modified to read as printed above.