Filed 8/28/13  Winchester v. Pike CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL WINCHESTER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRYAN PIKE,<br><br>    Defendant and Appellant. | G047110<br><br>(Super. Ct. No. A247345)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Daniel J. Didier, Judge.  Affirmed in part and reversed and remanded in part.

William P. Warden for Defendant and Appellant.

Vogt, Resnick & Sherak, David A. Sherak and Jeany A. Duff for Plaintiff and Respondent.

\*          \*          \*

Defendant Bryan Pike appeals from an almost $2.3 million judgment for recovery of trust property, financial elder abuse, and double damages entered in favor of plaintiff Michael Winchester. He claims there was insufficient evidence to support the judgment. We agree one of the items is not supported by substantial evidence. We reverse as to that amount and remand to the trial court to determine the new amount of the judgment. Otherwise we affirm.

FACTS AND PROCEDURAL HISTORY

Plaintiff was the son of Norma L. Winchester (decedent), who is now deceased. Defendant is married to Maria Pike (Maria), decedent's niece. In November 2000, the then 71-year-old decedent executed a family trust (trust), naming Maria as the trustee; the trust also provided for two successor trustees. Plaintiff was the sole beneficiary. Concurrently, decedent appointed Maria as her attorney in fact under a power of attorney for decedent's financial affairs. In August 2001 decedent's physician diagnosed her with "progressive and irr[e]versible Alzheimer's Disease," and unable to "make any financial . . . decision . . . ." From June 2001 until her death decedent resided at care facilities.

In 2000 decedent had a Vanguard account (Vanguard account) with a balance of just over $61,000. In October Maria used more than $53,000 from that account to purchase a Lincoln Navigator for herself. In October 2000 and January 2001 two checks totaling $5,000 were written to Maria from the account. The balance in the account was "depleted" by June. In 2001 Maria sold the Lincoln for $27,500 in cash. There was a deposit for that amount in defendant and Maria's joint savings account (joint account). Maria was not working at the time. Defendant did not remember an employer paying that amount.

2

At the end of 2000 decedent transferred a parcel of real property (property), containing two small single-family residences, to the trust. In August 2001 defendant bought the property from the trust for $330,000. The property, appraised at $334,500, was not listed. The appraisal stated the "proposed sale [was] a transfer from aunt to niece." An addendum to the appraisal stated its purpose was "to assist the . . . client (listed as "Pike") in evaluating the . . . property for loan[-]making decisions in federally related transactions." The intended use was "for a mortgage finance transaction only" and not "for any other use." After this action was filed, Maria sent a letter to plaintiff's lawyers, stating, among other things, that the other trustees approved defendant's purchase of the house, as "evidenced by their signatures included on the title documents." Defendant points to no documents in the record bearing such signatures.

Defendant made no down payment but executed a note secured by a trust deed for $280,500 in favor of an institutional lender. He also executed a 30-year note secured by a second trust deed for $49,500 in favor of the trust. That note bore interest at 7 percent per annum, with no interest to be paid until the note was due. Maria, as trustee, executed both a grant deed and an interspousal grant deed in defendant's favor, showing title as defendant's separate property. Defendant collected rent of more than $52,000 on the two residences. Defendant testified both he and Maria would benefit from transfer of the property to him.

In 2002 defendant refinanced the property, borrowing $310,000 and taking out some cash. In April 2003 defendant sold the property for $649,000. Defendant paid $49,000 to decedent for the "silent 2nd" into the trust's account at Bank of America (BofA account); he paid no interest. Net proceeds of approximately $212,300 were paid to defendant.

On May 21, a check for $10,000 was written from the BofA account and two weeks later another check for $30,000 was written from the same account. On May

3

a deposit for almost $13,000 was made into the joint account and on May 30 a $30,000 deposit was made to that account.

In September 2001 the trust purchased a $200,000 annuity (annuity) showing plaintiff as the primary beneficiary. The sum of $185,000 was withdrawn from the annuity between March 2002 and August 2004. In April 2005 Maria surrendered the annuity and withdrew the remaining amount of just over $12,000.

For the period October 2000 through October 2005 more than $16,600 of a total of just over $38,000 in decedent's Social Security payments was directly deposited into the BofA account. Between May 2003 through February 2006 Maria debited almost $288,000 from the BofA account. Approximately $137,5000 was used to pay for decedent's care facility. From the remaining balance, Maria wrote almost $48,000 in checks for cash, to herself, or to defendant and paid just over $3,900 in car payments for defendant.

In April 2005 decedent had to apply for MediCal. In October 2005 Maria no longer managed decedent's affairs. Decedent died in February 2007. A few months later plaintiff's lawyers demanded an accounting from Maria. Over a year later in October 2008 the court ordered Maria to file an accounting. By the date of the trial in March 2012 Maria had failed to do so.

In February 2008 defendant and Maria filed for bankruptcy, which was "closed" at the end of 2010.

Plaintiff filed a petition against Maria and defendant. The causes of action against Maria were to compel an accounting, for breach of trust (Prob. Code, § 16400; all further statutory references are to the Probate Code unless otherwise stated), to surcharge her as trustee, to recover property (§ 850), to remove her as a trustee, financial elder abuse (Welf. & Inst. Code, § 15610.30), and double damages (§ 859). Defendant was also named in the causes of action for recovery of property, financial elder abuse, and double damages.

4

The case was tried on stipulated facts plus defendant's testimony. Defendant testified he was not the trustee and did not know what Maria did in that capacity. He also testified Maria took care of all their personal finances and he had no knowledge of that either. He stated the purchase price for the property was fair because repairs were needed and no commission was paid. He "just overlooked" paying any interest on the second trust deed and "rounded" the $49,500 due on the note to the trust to $49,000.

Maria did not appear at trial and the court found against her on all causes of action. As attorney in fact and trustee she engaged in self-dealing by wrongfully transferring the trust property to benefit herself and defendant. Her actions as to the Lincoln, Social Security payments, the annuity, and funds from the BofA account were "irregular" and in violation of her duties as the trustee. The court awarded judgment for the full amount sought, slightly less than $1.15 million and doubled it, and also awarded prejudgment interest of more than $424,000, and costs and attorney fees. Plaintiff obtained a judgment against defendant on these causes in the same amount awarded against Maria.

In ruling against defendant, the court found his testimony he did not know about his financial affairs because they were managed by Maria not credible. The purchase and sale of the real property were "a blatant violation of the trust" that defendant knew or should have known was "irregular." The property was owned by the trust and title was taken in defendant's name only. The purpose was to "extract money from the trust, through the . . . transaction that ultimately [was] funneled into real estate investments in Oklahoma, and were lost in bankruptcy."

The court found defendant was not protected by section 18100[1] because he did not act in good faith. Maria's actions as to the Lincoln, the annuity, rent income, Social Security payments, and transfers of sums from the trust account to the joint checking account were similarly "irregular" and in violation of the trustee's duties. Defendant was liable because he, as well as Maria, "substantially benefitted" from them.

The judgment amount is broken down as follows: 1) $649,000 from the sale of the property; 2) $52,260 for rental income from the property; 3) $200,000 withdrawn from the annuity; 4) $7,931.89 withdrawn from the Vanguard account; 5) $38,287,60 in Social Security income; 6) $147,374.87 withdrawn from the BofA account; and 7) $53,288.90 taken from the Vanguard account to purchase the Lincoln.

DISCUSSION

*1. Introduction*

Defendant's liability is intertwined with, and to some extent based on, Maria's liability as a trustee. Hence, some basic principles as to the duties and liabilities of a trustee are relevant. Section 16002, subdivision (a) provides a "trustee has a duty to administer the trust solely in the interest of the beneficiaries." Section 16004, subdivision (a) states a "trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary." And under section 16400, a trustee's violation any duty owing the beneficiary is breach of trust.

_____

[1] Section 18100 protects a third person from liability when dealing with a trustee if the third person "acts in good faith and for a valuable consideration and without actual knowledge that the trustee is exceeding the trustee's powers or improperly exercising them."

6

One need not be a trustee to be liable for financial elder abuse. Such abuse occurs when a person takes from or retains, or "assists in taking" or retaining, personal property of "an elder or dependent adult for a wrongful use or with intent to defraud, or both" or "by undue influence, as defined in Section 1575 of the Civil Code." (Welf. & Inst. Code, § 15610.30, subdivision (a) (1), (3).) A person takes or retains personal property when the elder or dependent person "is deprived of any property right." (*Id*., subd. (c).) One is deemed to have taken or retained property when he or she "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (*Id*., subd. (b).)

Of all the items comprising the judgment, defendant appeals only from the amounts awarded for sale of the property, the proceeds of the annuity, the Social Security income and proceeds of the BofA account, and the sum taken from the Vanguard account used to purchase the Lincoln.

## 2. *The Property*

Defendant complains the court erred in awarding the entire $649,000 proceeds from defendant's sale of the property. He claims he should have been given a credit for $289,500[2] he "paid through escrow" for purchase of the property. He also maintains there was no evidence the appraisal was incorrect or the property was worth more. Defendant misses the point.

The measure of damages is determined from the viewpoint of the trust, not defendant's. The trust lost the proceeds of the $649,000 sale it would have realized had defendant and Maria not engaged in the improper sale of the property to defendant. The fact the trust received some money from defendant's purchase does not accrue to his benefit. Further defendant did not pay $280,500 out of pocket. He borrowed that sum

---

[2] Defendant acknowledged in his reply brief the amount of the note secured by the first trust deed was $280,500.

and repaid it from the proceeds of the sale. Thus, he has already been credited with the amount he originally paid for the property. Anything more would be a double credit to him.

*3. Annuity*

The trust purchased the annuity in 2001 for the benefit of plaintiff. By 2005 Maria had withdrawn the entire $200,000. The judgment against both Maria and defendant included that sum. Defendant argues that, based on the timing of the purchase and the lack of evidence of a withdrawal of $200,000 from the BofA or Vanguard account, the annuity had to have been purchased with the $289,500 [*sic*] he paid to purchase the property. He asserts he should be given a credit for that amount, claiming that by charging him with the "full value" of the property and this $200,000, plaintiff received a double recovery. Defendant proceeds from a flawed premise.

This kind of thinking may be one reason Maria and defendant helped themselves to trust assets. Whatever the source of the funds, once they were used to purchase the annuity, the annuity belonged to the trust and not to Maria or defendant. The trust's assets were not defendant's personal candy jar and he had no right to them.

In his reply brief defendant makes a new argument there is no evidence he received any of the proceeds of the annuity. We do not consider this late argument raised for the first time in the reply brief. It would be unfair to do so because plaintiff did not have the opportunity to oppose it, and given the fact defendant made similar arguments on other issues, there was no valid reason he did not raise it in the opening brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.)

*4. BofA Account and Social Security Income*

Of the $38,000-plus Social Security income and the slightly more than $147,300 in the BofA account the court awarded plaintiff, defendant argues there was no

evidence to show he was liable. Instead, he claims, Maria was the culprit and his only involvement was his marriage to her.

But even defendant acknowledges his liability for the $49,000 paid on the second trust deed, the $27,500 from sale of the Lincoln, and the $40,000 written on the account and deposited into the joint account, all withdrawn from the BofA account. As to these amounts he essentially concedes the finding he knew or should have known all the transfers to the joint account were "irregular." Under the financial elder abuse statute defendant is liable for taking or assisting in taking or retaining the trust's property (Welf. & Inst. Code, § 15610.30), which is also recoverable under section 850.

Defendant complains plaintiff did show defendant "lived a lavish lifestyle" or that "Maria paid any debt for him." As to the latter, not so. Defendant neglects to mention in the opening brief the $3,900-plus paid out of the BofA account for his car payments and the $1,000 check Maria wrote to him, waiting until the reply brief to do so. And the court did not find credible his testimony he did not know about his financial affairs or Maria's activities. This is tantamount to a finding defendant knew or at least should have known of her misdeeds. Based on those facts and his purchase and sale of the property to the detriment of the trust, it was reasonable for the court to infer he benefitted from the entire amount, just as did Maria.

## 5. *Lincoln*

The court awarded plaintiff almost $52,300 based on Maria's purchase of a Lincoln using funds from the Vanguard account. She did this before she became the trustee. There is nothing in the record to show defendant knew about or participated in the purchase. The fact the complaint alleged defendant "assisted the [d]ecedent in managing her financial affairs" or "facilitated the transfer" of the Lincoln to Maria is not enough without some actual evidence. His later purchase of the property raises no inference because that occurred after Maria acquired the car. Nor had there been any

9

other misappropriation of funds at the time the Lincoln was purchased, at least that are shown in the record. There is evidence, however, and defendant admits, the $27,500 from the sale of the Lincoln was put into the joint account and he is liable for that sum.

## DISPOSITION

We reverse as to the $52,300 for purchase of the Lincoln and remand to the trial court to recalculate the proper amount of the judgment. In all other respects the judgment is affirmed. Plaintiff is entitled to costs on appeal.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

10