Filed 3/3/25  P. v. Encinas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099968 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE018165) |
| v. | |
| ANDREW ENCINAS, | |
| Defendant and Appellant. | |

A jury found defendant Andrew Encinas guilty of inflicting corporal injury on a dating partner, Maya P.  The trial court sentenced Encinas to three years of formal probation and 364 days in county jail.  On appeal, Encinas contends:  (1) the trial court erred in admitting recorded interviews of his sister by police as prior inconsistent statements, and (2) the prosecutor committed misconduct in presenting evidence and argument regarding uncharged acts of violence by Encinas in violation of the trial court's

1

pretrial order and also by failing to admonish witnesses to abide by the court's order.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of the instant appeal, we summarize the facts supporting the conviction and will expand on the facts necessary for resolution of the issues as we address them.

Maya met Encinas in 2017 and dated him for approximately four years, ending their relationship in May or June 2021.  She continued to see Encinas after the relationship ended.  By August 2021, Maya was living in an apartment in Sacramento and allowed Encinas to stay there because he did not have anywhere else to stay.  He had a key to the apartment.  At that time, Maya described their relationship as "very tumultuous" and "on-again, off-again."

On August 25, 2021, Maya was working in an office just a three-minute drive from her apartment.  She had been letting Encinas use her car because his was in the repair shop.  Encinas would drive her to work, pick her up for lunch, and drive her back.  That day he dropped her off at work and picked her up for lunch.  During lunch, Encinas tried to be affectionate, but Maya was not "in the mood."  Encinas got angry, told Maya she could walk to work, and left with her car.  Maya walked back to work but did not stay the entire day.  She had a "complete breakdown" and told her co-workers that this was "kind of [her] last straw."

Maya walked home at about 3:00 p.m., but Encinas was not there.  She took her dog for a walk and, when she got home, decided she needed Encinas out of her life.  Maya called Encinas's mother and then his sister, Lena Encinas,[1] asking for help.

---

[1]  Because Encinas and Lena share the same surname, we refer to Lena by her first name, with no disrespect intended.

2

Lena came over to Maya's apartment to help move her things out. Maya testified that she had "experienced a lot of violence from" Encinas and feared "a larger chaotic disruption and that [her] things would be destroyed." Lena and Maya began moving her things into Lena's car. Maya heard the front door unlock, prompting her to run to her bedroom and lock the door. From inside, she could hear Lena asking Encinas to leave. Maya recognized Encinas's voice and could see Lena and him on her home security camera, which was linked to her cell phone. She heard Encinas raise his voice when Lena told him she did not want him "to put his hands on anyone else."

When it became quieter, Maya unlocked her bedroom door and cracked it open to see if Encinas was leaving. Encinas charged at the door. He forced his way into the room and shoved Maya onto the bed. He then punched her in the ribs approximately five times. When the punches stopped, Maya saw Lena on Encinas's back, trying to pull him off. Maya tried to leave the bedroom, but Encinas threw a plastic milk carton filled with shampoos and conditioners at her, hitting her in the back and causing her to fall. Encinas began stomping on her back and kicking her legs. During the assault, Maya managed to call 911 but did not speak to the operator and lowered the volume of the call to prevent Encinas from realizing she had made the call.

Lena managed to pull Encinas off Maya and told her to run. Maya began banging on neighbors' doors, asking for someone to call 911. Encinas followed her, trying to slow her down and telling her they needed to talk. Maya remained on the phone with 911 as Encinas told her she had escalated the situation. He led her to a trail behind the apartment. Maya didn't want to go but followed Encinas because she was frightened. On the trail, they turned back toward the apartment and saw that the police had arrived. Encinas said, "Look what you've done," and "You don't know who you're messing with." He instructed Maya to call his sister and tell her to go home. Maya was still on the phone with 911, describing the situation while pretending to talk to Lena. Encinas

3

blamed her for what had happened, telling her to come up with an excuse for the police and not to tell them the truth.

The police tried to contact Maya several times during the walk; she eventually returned to the apartment. When Maya got near the apartment, she noticed Encinas was no longer with her. The first question a police officer asked her was, "What happened to your eye?" Maya was scared and made up a story that a dog pawed her face in the park. The officers walked her to her apartment to gather her things and then walked her to her car. Maya spent the night at Lena's apartment.

In the bathroom at Lena's apartment, Maya saw that she had a black eye, a shoe print on her shoulder, and a gash on her shin. The next day Maya called the female officer who had spoken to her the day before and told her about the altercation with Encinas.

The jury viewed video recordings of police interviews of Lena on August 25, 2021. In one video recording, Lena said Encinas pushed the door open and threw Maya on the ground. Lena pulled Encinas off Maya and he grabbed a crate full of items and threw it at Maya. Then he pushed Maya down and started punching her and kicked her in the back of the head. Lena pulled Encinas off Maya again and told her to run. Maya screamed for help in the hallway. In another video recording, Lena said Encinas did not live there but had been staying there. Maya wanted him out, but he did not want to leave. Lena said Encinas "always put his hands on [Maya], I guess this was the last straw." In a third video recording, Lena said, "I've never seen him act as bad as it was right now." In the fourth recording, Lena said, "he used to put his hands on me all the time and that's why I don't talk to him."

The prosecution presented the testimony of David Cropp, a licensed clinical social worker. Cropp testified as an expert on domestic violence, explaining the "cycle of violence" and counterintuitive behavior of domestic violence victims commonly seen, such as staying with abusive partners, refusing to leave abusive partners, not calling the

4

police, and/or not cooperating with law enforcement or prosecution efforts. Cross testified that victims frequently deny abuse after initially reporting it or offer an alternative explanation for their injuries. He did not testify regarding the specific facts of the case.

Encinas testified on his own behalf. He testified he did not meet Maya for lunch that day and returned home at around 9:00 or 10:00 p.m. His sister, Lena, whom he had not spoken to in six years, was the only person there. Lena berated Encinas, telling him that Maya was "trying to set [him] up." Encinas asked Lena where Maya was. Lena said that Maya had gone to get groceries but the dog indicated Maya was in her bedroom. Encinas yelled at Maya to unlock the door. Lena pushed Encinas and pinned him against an air conditioning unit. Encinas broke her grip and sprinted for the door to Maya's bedroom. Inside, Maya was standing frozen. Encinas told her they had to leave. At that moment, Lena tackled him. Maya was directly in front of him. Encinas quickly flipped Maya around and they fell on the bed. Lena was on top of them; all three were "like a sandwich." Encinas was trying to move Lena off, but she was heavy. Encinas broke Lena's grip, flipped Maya around, grabbed her hand, and they ran out the door.

As Encinas and Maya were running out the door, Encinas stepped on a sock and fell forward. As he fell, he pulled Maya down with him, let go of her hand, and grabbed a crate that was on a barstool, swinging it around. The contents went everywhere. He got up and told Maya, who was on the floor, that they had to leave. Lena jumped on Encinas's back. Maya grabbed Encinas's hand as he was hunched over with Lena on top of him. Encinas let go of Maya's hand, lost his footing, and stepped on Maya once by accident. Encinas jumped forward and Lena fell on top of him and rolled off.

Encinas asked Maya if she was okay and offered his hand. Maya took his hand. Outside the apartment, Maya began banging on neighbors' doors. Encinas told her to stop because she would get in trouble. Maya took Encinas's hand and followed him down the stairwell, and Encinas took her to a nearby hill.

Encinas denied punching or stomping on Maya or telling her to lie to the police. He acknowledged telling her that "people in court are going to come talk to you." Encinas testified that Maya had abused him emotionally "for years," because she would "act out" when he told her "no."

The jury found Encinas guilty of willful infliction of corporal injury on a dating partner. (Pen. Code, § 273.5, subd. (a).) The trial court placed Encinas on three years of formal probation and ordered him to serve 364 days in county jail. Encinas timely appealed in December 2023. His opening brief was filed in August 2024, and this case became fully briefed on December 12, 2024.

DISCUSSION

I

*Prior Inconsistent Statements*

Encinas contends the trial court erred in admitting the video recordings of interviews with Lena as prior inconsistent statements. Encinas argues that Lena's testimony at trial about her lack of memory of the events was not inconsistent with her statements in the video recordings. We disagree.

At trial, when asked if Maya was dating Encinas in 2021, Lena testified, "I don't remember much of 2021 honestly." Lena testified that she had no independent memory of the incident at Maya's apartment because, "During that time I was taking a lot of psychedelics at the time, I guess you could say, so I really don't remember a lot." Lena testified that she did not recall speaking to the police on August 25, 2021, reporting an altercation between Encinas and Maya, or being at Maya's apartment. Lena referred to her brother as a "good stand-up guy," and testified he was "like a second dad to me," she communicated with him regularly, and she did not recall telling police in August 2021 that she did not communicate with her brother because he had put his hands on her.

When the prosecutor began to ask Lena questions about one of the video recordings, the defense objected in an off-the-record sidebar conference to the People's

6

introduction of this evidence as a prior inconsistent statement, citing Lena's lack of memory. The trial court observed that Lena's "statement that she doesn't remember at all is, frankly, not believable and the jury could reasonably also come to that conclusion." The court ruled the recording could be admitted as a prior inconsistent statement. Defense counsel asked if the court was making a finding that Lena's claim of lack of memory was evasive and untruthful. The trial court responded: "I do find her claim that she doesn't remember anything unbelievable, untruthful."

After the conference, the prosecutor played a portion of one of the video recordings. Lena then testified that she was the person in the recording but she did not recognize the apartment, did not know where she was in the video, and did not recall telling a police officer that Encinas threw Maya to the ground, threw a crate at her, punched and kicked her, or that Lena pulled Encinas off Maya, told her to run, and heard her screaming in the hallway. On cross-examination, Lena testified she did not recall "2020 to half of 2022." She denied that Encinas had ever been violent with her or anyone else, instead testifying that he "was always taking care of me" and "tried to protect me a lot . . . ."

During the testimony of a police officer who had responded at the scene, the prosecutor played video recordings of Lena's interviews to the jury.

At the end of testimony that day, the trial court further explained its reasons for overruling the defense's hearsay objection. "I understand the defense was objecting to admission of Lena Encinas's prior statement that was captured on [a] body worn camera that [the prosecutor] had isolated parts of that statement to impeach her. They were captured on People's 7, 8, 9, and 10. And we did have discussions—I think they were off the record—about these prior statements. . . . . And I found that her testimony that she did not remember virtually anything from that day and that year not credible so I found the jury could find that her statements that she didn't remember to be inconsistent with her prior statement."

7

Under Evidence Code section 1235, a witness's prior statement is not made inadmissible by the hearsay rule if it is inconsistent with the witness's testimony at trial. (Evid. Code, § 1235; see also *id.*, § 770 [evidence of prior inconsistent statement excluded unless witness is afforded opportunity to explain or deny statement and witness has not been excused].) Evidence Code section 1235 does not apply if a witness merely does not remember the event, or details about the event, that he or she previously described. (*People v. Sapp* (2003) 31 Cal.4th 240, 296.) The prior statement of a witness who genuinely does not remember the event or the details of it at trial is not inconsistent and is not admissible under the statute. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 418; *People v. Sam* (1969) 71 Cal.2d 194, 208-210.)

The rule prohibiting application of Evidence Code section 1235 to the prior statements of a forgetful witness does not apply where the witness is deliberately evasive or feigns lack of memory at trial. "[A] trial witness's deliberately evasive forgetfulness is an implied denial of prior statements, which creates 'inconsistency in effect' and authorizes admission of the witness's prior statements under Evidence Code section 1235." (*People v. Perez* (2000) 82 Cal.App.4th 760, 764.) As long as there is a reasonable basis for concluding that a witness's lack of memory is evasive and untruthful, admission of a prior statement is proper. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220; *People v. Ledesma* (2006) 39 Cal.4th 641, 711; *People v. Rodriguez* (2014) 58 Cal.4th 587, 633; *People v. Mataele* (2022) 13 Cal.5th 372, 415 (*Mataele*).) "[T]he true point of distinction is not whether the witness selectively remembers some and forgets other circumstances, but rather whether the record supports a finding that the forgetfulness at trial is deliberately evasive." (*Perez*, at p. 764.)

"We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion. [Citation.] A trial court's decision to admit or exclude evidence ' " 'will not be disturbed unless there is a showing that the trial court acted in an arbitrary,

8

capricious, or absurd manner resulting in a miscarriage of justice.' " ' " (*Mataele*, *supra*, 13 Cal.5th at pp. 413-414.)

We conclude there was sufficient basis for the trial court to find that Lena's forgetfulness at trial was deliberate and the court did not abuse its discretion in finding the video recordings admissible under Evidence Code section 1235. (*Mataele*, *supra*, 13 Cal.5th at p. 416.) At trial, Lena referred to her brother as a "good stand-up guy," said he was like a second father to her, and tried to care for her and protect her. She testified she could not recall making any negative statements about him to police. She also testified that she was in regular communication with Encinas. However, when asked by defense counsel about his relationship with his sister, Encinas testified that, before she appeared in Maya's apartment on August 25, 2021, he had not seen or spoken to her in six years. Thus, the trial court had a reasonable basis to conclude that Lena's objective at trial had become to help her brother avoid conviction and incarceration by falsely attesting to his good character and their good relationship and denying any recollection of her seeking to aid Maya on August 25, 2021. (See *People v. O'Quinn* (1980) 109 Cal.App.3d 219, 224 [witness who was the sister of two defendants and the girlfriend of another defendant, the father of her child, had "ample motive . . . to be evasive in her testimony"]; see also *People v. Ledesma*, *supra*, 39 Cal.4th at p. 712 [reasonable basis for trial court's conclusion that witness was evasive included her friendship with the defendant].) Further, when shown part of one of the video recordings, Lena agreed that it showed her but claimed it did not refresh her recollection that she spoke to the police. (See *ibid.* [evidence of evasion included witness's claim that reading transcript and hearing tape recording did not refresh her recollection].) In addition, Lena attributed her inability to remember a period from "2020 to half of 2022" to her daily use of psychedelic mushrooms, which caused her to hallucinate. But neither Lena nor the defense offered any evidence, let alone medical evidence, that psychedelic mushrooms cause memory loss of the magnitude Lena reported. (See *People v. Coffman and Marlow*

(2004) 34 Cal.4th 1, 78 ["Marlow asserts that short-term memory loss is a known side effect of Elavil, but no such medical evidence was presented to the trial court in this case"].)

Accordingly, we find no error in the admission of video recordings of Lena's statements to police officers on August 25, 2021.

## II

### *Uncharged Crimes*

Encinas contends the prosecutor committed misconduct by eliciting testimony of uncharged crimes, failing to admonish witnesses not to testify to uncharged crimes, and using uncharged crimes in closing argument. Encinas has forfeited this claim because defense counsel failed to object in the trial court. Anticipating forfeiture, Encinas contends that defense counsel's failure to object constituted ineffective assistance of counsel. This claim fails because we conclude there is no reasonable probability that the outcome of the trial would have been different had defense counsel objected.

Encinas filed an in limine motion to exclude evidence of other crimes against him, including prior acts of violence, unless specifically noticed by the prosecution. The People did not object and the court granted the motion. Both parties requested that all witnesses be advised of the court's rulings on in limine motions. The court granted the request as to both parties.

Encinas contends that, despite these rulings, there were multiple instances where witnesses referred to other acts of violence on his part. For example, Maya testified: "I've experienced a lot of violence from defendant"; "I felt scared for my life as it's not the first time I've been threatened with that"; and, explaining why she lied to police, "I had just been stomped on, I had been punched, and I was in fear for my life. It wasn't the first time." Encinas cites as a "more egregious example" of the prosecution's failure to comply with the court's order, the portions of the video recordings played for the jury where Lena states: "[Encinas] always puts his hands on her, I guess this was the last

10

straw"; and "this has been going on—like I said; he used to put his hands on me all the time and that's why I don't talk to him."

Encinas claims that the prosecutor committed further misconduct by referring to this evidence in closing argument. The prosecutor argued that Lena "had suffered abuse at the hands of the defendant and that's actually the reason why they don't communicate anymore." In rebuttal, the prosecutor also argued, "We know for a fact that this was not the first time the defendant had put hands on Maya."

Encinas acknowledges that defense counsel did not raise any objection to the prosecutor's presentation of this evidence or argument. Defense counsel's failure to object in a timely manner to prosecutorial misconduct results in forfeiture of the claim on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952; *People v. Rivera* (2019) 7 Cal.5th 306, 341 [failure to object to prosecutor's use of evidence of uncharged misconduct forfeited contention on appeal].)

In Encinas's reply brief, he summarily argues that this court may nonetheless consider his claims of prosecutorial misconduct: (1) as a legal issue requiring de novo review; (2) because judicial economy is better served by review of a claim on direct appeal rather than forfeited, which would convert the issue into a habeas corpus claim; and (3) even where a claim is forfeited, this court has discretion to consider a theory involving only a legal question raised for the first time on appeal. " 'Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. To withhold a point until the closing brief deprives the respondent of the opportunity to answer it or requires the effort and delay of an additional brief by permission.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

Encinas does not offer a reason why these points were not raised before, other than to note that the People argued in respondent's brief that Encinas forfeited any challenge on appeal to prosecutorial misconduct. However, the People did not raise forfeiture for the first time; Encinas did in his opening brief. Encinas argued that, should this court find that defense counsel's failure to object forfeited the claim on appeal, he received ineffective assistance of counsel. We decline to address new arguments Encinas raised for the first time in his reply brief, but instead turn to his ineffective assistance argument.

To prevail on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient, and the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) That is, "defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Farnam* (2002) 28 Cal.4th 107, 201.)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

We conclude Encinas cannot demonstrate prejudice from the introduction of evidence and argument about other instances where he engaged in violent conduct. The references to such conduct in the testimony of Maya and the police interviews of Lena—repeated in the prosecutor's closing arguments—were vague, general, and brief. By contrast, Maya's testimony at trial and Lena's statements to police—both describing

Encinas punching Maya, throwing a crate that knocked her down, and then kicking and stomping on her as she lay on the floor—were specific and detailed. Further, Lena's statements to the police on August 25, 2021, were fully consistent with Maya's testimony. Encinas claims prejudice, asserting "this case was a classic he-said she-said case which hinged on the questionable credibility of [Maya]." However, after the prosecution played the jury the video recordings of Lena's police interviews—which we have concluded were properly admitted—this was not the case. The recordings corroborated Maya's testimony, impeached Lena's trial testimony, and severely undermined Encinas's version of the events. Under these circumstances, Encinas cannot show that but for his trial counsel's failure to object, the jury's verdict would have been different. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1166-1167 [the defendant failed to show prejudice from defense counsel's claimed incompetence considering the strong evidence against him].) Therefore, Encinas's claim of ineffective assistance of counsel fails. (*Strickland*, *supra*, 466 U.S. at p. 694.)

DISPOSITION

The judgment is affirmed.

            /s/
BOULWARE EURIE, J.

We concur:

      /s/
EARL, P. J.

      /s/
FEINBERG, J.

13