Filed 3/3/20

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of LONNIE LAMONT ASHLOCK, Deceased. | |
| GABRIEL ASHLOCK, as Administrator, etc., | F078083 |
| Plaintiff and Respondent, | (Super. Ct. No. 445230) |
| v. | **OPINION** |
| STACEY CARLSON, | |
| Defendant and Appellant. | |
| Estate of LONNIE LAMONT ASHLOCK, Deceased. | |
| STACEY CARLSON, as Executor, etc., | |
| Petitioner and Appellant, | (Super. Ct. No. 445304) |
| v. | |
| GABRIEL ASHLOCK, | |
| Objector and Respondent. | |
| GABRIEL ASHLOCK, | |
| Plaintiff and Respondent, | (Super. Ct. No. 445360) |
| v. | |
| STACEY CARLSON, as Trustee, etc., | |
| Defendant and Appellant. | |

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I–IV and parts V.B–VI of the DISCUSSION.

APPEAL from a judgment of the Superior Court of Stanislaus County. Timothy W. Salter, Judge.

Crabtree Schmidt, and Robert W. Crabtree for Defendant and Appellant.

Schofield & Associates, Louis F. Schofield; Freeman Firm, Thomas H. Keeling and Franklin J. Brummett for Plaintiff and Respondent.

-ooOoo-

This is the third appeal in a consolidated probate matter involving Stacey Carlson (Stacey) and Gabriel Ashlock (Gabriel), both of whom claimed entitlement to the estate of Gabriel's deceased father. We previously affirmed a judgment on the merits of a trust dispute, a will contest, and claims against Stacey for breach of fiduciary duty and financial abuse of a dependent adult. (*Estate of Ashlock* (Mar. 14, 2019, F074969) [nonpub. opn.] (*Ashlock I*).) We later affirmed an award of attorney fees. (*Estate of Ashlock* (May 3, 2019, F076941) [nonpub. opn.] (*Ashlock II*).)

Stacey now appeals from a judgment entered in a bifurcated proceeding on issues of damages and remedies. The monetary portion of the judgment exceeds $11 million. Stacey was found liable under Probate Code section 859, which imposes a penalty of "twice the value of the property recovered" in certain actions brought under section 850 et seq. (All undesignated statutory references are to the Probate Code.) Among other contentions, Stacey argues the trial court misinterpreted the quoted language and awarded "triple" damages rather than "double damages." We resolve the issue of statutory interpretation in the published part of the opinion. The remaining claims challenge the sufficiency of the evidence.

Multiple parcels of real property, collectively valued at $5,148,000, were recovered by the decedent's estate pursuant to section 850 et seq. The trial court found the properties had been misappropriated in bad faith and thus imposed a penalty of $10,296,000. We conclude this figure was correctly calculated under section 859.

2.

Stacey was also surcharged approximately $838,777 for misappropriating cash and personal property. Based on a finding of bad faith, she was held liable under section 859 for an additional penalty of approximately $1,677,554. Stacey alleges the evidence is insufficient to support any of the surcharges.

We disagree with all but one of Stacey's contentions. She has identified the miscalculation of a surcharge for a series of financial transactions in March 2014, and the error impacts her total liability under section 859. The nature of the error precludes us from modifying the judgment ourselves. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

We take judicial notice of the records and opinions in *Ashlock I* and *Ashlock II*, and we incorporate by reference our earlier summaries of the factual and procedural background. In addition, Gabriel's unopposed request for judicial notice of the remittitur issued in *Ashlock I* is hereby granted. (Evid. Code, §§ 452, subds. (a), (d), 459.) As previously explained, decedent Lonnie Lamont Ashlock (Lonnie) passed away in October 2013. Soon afterwards, Gabriel and Stacey became embroiled in litigation over Lonnie's estate.

Stacey petitioned to admit into probate a will signed by Lonnie in 2009. Gabriel opposed the petition on multiple grounds, including the fact Stacey had drafted the will and named herself the sole beneficiary. Gabriel also filed a petition challenging the validity of multiple trust instruments, which Stacey had drafted and executed on Lonnie's behalf in 2013. The will contest and trust petition were consolidated with other matters not relevant to this appeal.

The trust petition requested relief under section 850 et seq., including the return of 18 parcels of real property to Lonnie's estate. One of those properties, the "Snelling Ranch," contained approximately 190 acres of income-producing almond trees. The petition alleged Stacey's various actions constituted "[w]rongful [t]aking" within the

3.

meaning of section 859 and claimed the petitioner, Gabriel, was "entitled to 'twice the value of the property recovered' in addition to any other remedies available in law."

A 53-day bench trial was conducted between November 2014 and February 2016. The final 13 days of trial were devoted to accounting issues. Stacey was ordered to account for all actions taken under her power of attorney, which Lonnie had granted to her in 2005. She was also ordered to account for "all activities/transactions taken pursuant to the 'partnerships'" she had allegedly entered into with Lonnie in 2009, namely, "Little Hills Ranch" and "Investwest Properties." The so-called "accounting phase" included expert witness testimony by certified public accountants.

On October 25, 2016, the trial court entered its "Interim Judgment" on the will contest and trust petition, which incorporated by reference a lengthy statement of decision. Lonnie was found to have been suffering from dementia as of "approximately the middle of 2008," and, from "that point onward," to have "lacked capacity to enter contracts and sign testamentary documents." Accordingly, and for independent reasons under former section 21350, the 2009 will was ruled invalid.

Relevant to this appeal, the *Ashlock I* judgment included findings that Stacey had forged documents purporting to show the creation, in 2009, of the Little Hills Ranch and Investwest Properties partnerships. The alleged partnerships were found to have never existed. Moreover, Stacey was found to have committed "fraud in the setting up of the 'partnerships.'"

The validity of the partnerships was an important issue in relation to the claims under section 850 et seq. Stacey had used her power of attorney to transfer title to most of Lonnie's real estate into the name of Investwest Properties. She then deeded Lonnie's properties into the 2013 trusts. The "sham" partnerships, which is how the trial court described them, added a layer of protection against any legal challenges to Stacey's taking of the real estate portfolio and other property. During trial, she conceded the trusts were invalid but argued 14 of the 18 properties were partnership assets and did not

belong to the estate. One of the other four properties was the Snelling Ranch, which Stacey similarly alleged was "subject to the effects of the partnership with [her]." She thus relied on the partnership defense to justify the comingling of income from the Snelling Ranch with money in her own bank account.

As part of the *Ashlock I* judgment, the trial court imposed a constructive trust on all properties that had been transferred into the invalidated trusts. It also surcharged Stacey a total of $365,152.92 for the use of estate funds to pay for her legal expenses and the expenses of third parties. The trial court reserved jurisdiction to resolve additional issues, including the amount of "damages" to which Gabriel was entitled under section 859 and other statutes.

In December 2016, Stacey filed her notice of appeal in *Ashlock I*. While the appeal was pending, the parties continued to litigate other matters in the consolidated action. It appears the damages and remedies phase consisted of briefing and written objections, with the parties basing their arguments on evidence presented during the initial 53 days of trial.

On March 19, 2018, the trial court issued its "Second Statement of Decision Regarding Issues of Accounting and Damages." (Some capitalization omitted.) The parties subsequently filed objections thereto. On July 13, 2018, the trial court issued two minute orders. The minute orders contained rulings on the objections and indicated the statement of decision would be modified accordingly. On the same date, the trial court issued its "Interim Judgment 2 on Second Amended Statement of Decision" (the judgment), i.e., the judgment from which the current appeal is taken.[1]

_____

[1]Gabriel's briefing explains the trial court never issued an amended version of its "Second Statement of Decision." Rather, as indicated on page 1 of the judgment, it deemed the March 19, 2018, statement of decision to have been amended via the July 13, 2018, minute orders. For further clarification, it is noted the March 19, 2018, statement of decision was actually the first one to address "Issues of Accounting and Damages." Use of the word "Second" in the title was apparently intended to distinguish it from the earlier statement of decision incorporated into the *Ashlock I* judgment. Hereafter, unless otherwise indicated, "the statement

5.

Although Gabriel had argued for surcharges in excess of $3.8 million, the trial court denied most of his claims. As detailed in our Discussion, *post*, it imposed five surcharges against Stacey totaling $473,624.20. That amount was added to the surcharges of $365,152.92 in *Ashlock I* to determine the penalty under section 859, which was calculated to be $1,677,554.20. Gabriel accurately notes the trial court's calculation was off by four cents ($365,152.92 + $473,624.20 = $838,777.12. $838,777.12 × 2 = $1,677,554.24). The penalty was increased by $10,296,000, which represented twice the value of the 18 parcels of real estate. Therefore, Stacey's total liability under section 859 was determined to be $11,973,554.20.

## DISCUSSION

### I.      Law of the Case Doctrine[*]

Stacey challenges most of the trial court's surcharges, its denial of her request for offset credits, and her liability under section 859. She also attempts to litigate issues previously disposed of in *Ashlock I*. The latter efforts implicate the law of the case doctrine.

"The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal ….'" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893.) "An appellate court's decision on the sufficiency of evidence comes clearly within the doctrine." (*Wells v. Lloyd* (1942) 21 Cal.2d 452, 455; accord, *People v. Barragan* (2004) 32 Cal.4th 236, 246.) Therefore, we will not address the litany of arguments in the opening brief at pages 34–38 and 45–47, in

of decision" refers to the March 19, 2018, document as modified by the July 13, 2018, minute orders.

[*]See footnote, *ante*, page 1.

the reply brief at pages 29–41, and elsewhere, that were previously considered and rejected in *Ashlock I*.

## II. Forfeiture of New Claims in the Reply Brief[*]

The prohibition against raising new issues in a reply brief is well established. (E.g., *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"]; *Christoff v. Union Pacific Railroad Co*. (2005) 134 Cal.App.4th 118, 125 ["an appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal"].) "'"To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission."'" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Thus, "[w]hen new arguments are raised in the reply brief, to which respondent has no opportunity to respond, we are not required to consider them." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 171.)

Stacey's reply brief raises several new issues. The most notable example is a claim regarding section 859. In her opening brief, she argued there was insufficient evidence of the type of misconduct the statute requires. In her reply, she claims the trial court misinterpreted the language of section 859 and thus miscalculated the penalty by several million dollars. The new contention is based on an appellate court opinion published by another district approximately seven weeks prior to the filing of Stacey's *opening brief*.

Because the statutory interpretation claim presents an important legal issue substantially affecting the parties' rights, we exercise our discretion to address it despite the forfeiture. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an

---

[*]See footnote, *ante*, page 1.

important legal issue"].) Accordingly, we have allowed Gabriel to respond to the claim in a supplemental brief. We do not excuse Stacey's forfeiture of the remaining arguments not previously asserted in her opening brief.

The unexcused forfeited claims include Stacey's challenge to the appraised value of the 18 properties used to calculate the section 859 penalty, as well as contentions regarding alleged third party interests in those parcels and/or other real property affected by the judgment.[2] Likewise, we will not consider the new fact-intensive arguments on pages 14–29 of appellant's reply brief concerning Stacey's offset claims. (See further discussion, *post*.) She provided only a cursory discussion of those claims on pages 47–48 of her opening brief and deprived Gabriel of the opportunity to refute her belated assertions. (*Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 764; accord, *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294–1295.)

In the final section of her reply, Stacey contends a "rush[] to judgment" by the trial court "led to [a] miscarriage of justice warranting a reversal." The "rush to judgment" language also appears in her opening brief in the context of alleging judicial bias during the 2014–2016 time period. If Stacey is attempting to relitigate the judicial bias claim we rejected in *Ashlock I*, she is barred from doing so under the law of the case doctrine. The reply also insinuates the trial judge "rushed" through the damages and remedies phase because of his pending retirement, but this argument was not made in the opening brief. Therefore, it is forfeited.

## A.    Appellant's Motion to Augment the Record on Appeal

Stacey elected not to designate any oral proceedings for inclusion in the record on appeal and submitted an appendix in lieu of a clerk's transcript. (See Cal. Rules of Court,

---

[2]Apart from the 18 parcels relevant to the section 859 penalty, the judgment imposes a constructive trust upon four additional properties. Both sides addressed the issue of third party rights below, and Gabriel insisted Stacey's arguments were meritless. Incidentally, the Louise Avenue property discussed on pages 11–13 of the reply, which Stacey cites "as an exemplar," is *not* one of the properties affected by the judgment.

8.

rules 8.124 & 8.130.)  She later filed a "Reply Appendix" containing transcripts from court proceedings held on October 7, 2015, May 25, 2018, and June 26, 2018.  Gabriel filed a motion to strike those items from the appendix, which prompted Stacey to file a motion to augment the record on appeal.

The October 7, 2015, hearing transcript is already part of the *Ashlock I* record.  It is contained within volume 19 of the reporter's transcript at pages 4668–4713.  We have taken judicial notice of the entire record in *Ashlock I*.  Therefore, augmenting the record on appeal to include a separate transcript of this hearing would be redundant.

Stacey cites to the May 25, 2018, hearing transcript at pages 42–43 of her reply brief to support her "rush to judgment" claim.  We have refused to consider her arguments on grounds of forfeiture and the law of the case.  Therefore, Stacey has failed to show good cause for augmenting the record with the May 25, 2018, transcript.  (See Ct. App., Fifth Dist., Local Rules of Ct., rule 1(b) ["Appellant should file requests for augmentation in one motion within 40 days of the filing of the record.  … Thereafter, motions to augment will not be granted except upon a showing of good cause for the delay"].)

The June 26, 2018, transcript primarily concerns an issue of standing that has no relevance to this appeal.  Stacey does not cite or discuss the transcript in her reply brief, and her moving papers do not explain how it supports or even relates to any properly asserted claim in her opening brief.  Therefore, good cause has not been shown for augmenting the record with the June 26, 2018, transcript.  (Ct. App., Fifth Dist., Local Rules of Ct., rule 1(b); cf. *Foothill Properties v. Lyon/Copley Corona Associates* (1996) 46 Cal.App.4th 1542, 1558, fn. 17 [denying a request to augment the record with irrelevant material]; *Carleton v. Tortosa* (1993) 14 Cal.App.4th 745, 759, fn. 5 [same].)

For the above reasons, the motion to augment is denied.

## B.     Respondent's Motion to Strike

Gabriel moved to strike (1) the transcripts in the Reply Appendix and (2) portions of the reply brief addressing claims not previously asserted in the opening brief.  Gabriel was concerned about Stacey's new statutory interpretation argument, but we have excused her forfeiture of that claim and allowed Gabriel to file a supplemental brief, which he has done.  We have refused to consider Stacey's other forfeited claims, as well as materials pertaining to the forfeited claims.  For these reasons and those given for the denial of Stacey's motion to augment, the motion to strike is also denied.

## III.     Sufficiency of the Evidence re: Surcharges[*]

### A.     Additional Background

Stacey produced accountings of transactions she performed as Lonnie's attorney-in-fact and as a putative equity partner in his businesses.  The accountings included QuickBooks™ reports and other self-created ledgers and spreadsheets.[3]  The judgment explains that "once the accountings were filed, each one had errors and omissions.  None of the accountings balanced."

The parties' experts evaluated Stacey's accountings and testified to their opinions.  Stacey's expert, Michael Pimental, CPA, provided a supportive opinion with regard to her accountings of the alleged partnership transactions.  However, rather than attempting to verify all of the bookkeeping entries with independent documentation (e.g., bank statements), he "did a judgmental sample."  As explained in finding No. 80 of the judgment, the expert admitted his lack of familiarity with the Snelling Ranch and Stacey's own farming operations at her residence in Denair.  The court also noted the expert's failure to review Lonnie's tax returns or bank records for Stacey's Bank of the West account ending in 5255, i.e., the one into which she had comingled Snelling Ranch

---

[*]See footnote, *ante*, page 1.

[3]We take judicial notice of the fact that QuickBooks is the brand name of certain widely used financial management software.  (Evid. Code, § 452, subds. (g), (h).)

income with her own money. Finding No. 80 further states, "The Court considers the testimony of Mr. Pimental to be ineffective, and therefore gives it little weight."

Christopher Kelley, CPA, is a forensic accountant who testified on behalf of the estate. He identified errors in the methodology used by Stacey to create her accountings and specific "deficiencies" and "discrepancies" therein. In his opinion, "You shouldn't have any discrepancies. You should be able to account for all of the funds, and you should have adequate documentation to support what those were to be able to have the court accounting balance in terms of where your charges equal your credits."

In four separate instances, Stacey was found to have failed to account for certain sums of money to which the estate was entitled. Accordingly, the trial court imposed surcharges of $300,000, $100,000, $27,624.20, and $6,000. A fifth surcharge of $40,000 was imposed because of her failure to return a gun collection to the estate.

## B.     Standard of Review

Stacey does not address the standard of review for the surcharges. Her opening brief discusses the de novo standard, which applies to questions of law, but the primary legal issue is one she does not raise, i.e., which party had the burden of proof below. Stacey's arguments ultimately concern the trial court's factual findings, so the standard of review is deferential to the judgment. (See *Estate of Fain* (1999) 75 Cal.App.4th 973, 987, 992–994 [applying substantial evidence test to claims involving surcharges in a probate matter].)

The trial court, in reliance on *Purdy v. Johnson* (1917) 174 Cal. 521 (*Purdy*), concluded it was Stacey's burden to substantiate her accountings. In *Purdy*, a trust beneficiary alleged misconduct by two trustees, including failures to account and the comingling of trust assets with their personal assets. (*Id*. at pp. 523–524.) In reversing a judgment entered in favor of the trustees, the California Supreme Court explained:

> "The entire trial was conducted upon the erroneous theory that the burden
> of proof was upon the beneficiary to point out the particulars in which the
> account was erroneous, and that she was bound to go forward and establish

11.

affirmatively the impropriety of the charges and credits which she assailed. Such is not the law." (*Id.* at p. 527.)

Rather, "it is the duty of the trustees to support every item of their account, and … wherever they fail to support the correctness of a charge or a credit by satisfactory evidence, the item must be disallowed." (*Id.* at p. 531.)

We see no error in the trial court's assignment of the burden of proof to Stacey. (See § 1064, subd. (b) ["The filing of an account shall be deemed to include a petition requesting its approval"].) Stacey does not discuss *Purdy*, nor does she deny it was her burden to substantiate the accountings. While the facts of *Purdy* differ from the unusual circumstances of this case, a common element is the existence of fiduciary duties. Just as a trustee owes fiduciary duties to a trust beneficiary, Stacey owed such duties to Lonnie as his attorney-in-fact and, pursuant to her own contentions, as a putative business partner and putative trustee. (See § 39 [trustees and attorneys-in-fact are fiduciaries]; *Oliker v. Gershunoff* (1987) 195 Cal.App.3d 1288, 1305 ["Partners are trustees for each other and, in all proceedings involving the conduct of the partnership, each partner is obligated to act in the highest co-faith to his copartners"]; *Rosenfeld*, *Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035, 1051 [partners "who fail to keep proper records of the dates and amounts of receipts and expenses … have the burden of establishing that data"]; see also *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101–1102 ["A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent"].)

> "Where, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor. That is because unless the trial court makes specific findings of fact in favor of the [appellant,] we presume the trial court found the [appellant's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of

12.

witnesses or to reweigh the evidence." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486 (*Bookout*).)

Given the parties' respective burdens, the standard of review is as articulated in *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229 (*Shaw*).

> "When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. … Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Id.* at p. 279, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571; accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

### 1. Surcharge of $300,000

The first surcharge was based on the movement of funds generated by the Snelling Ranch in and out of Stacey's bank account ending in 5255. She opened the account in 1999 under the name Little Hills Ltd., which was a fictitious business name used in connection with almond farming at her personal residence in Denair. In December 2008, Stacey began depositing income from the Snelling Ranch into the 5255 account. This continued until 2015. Lonnie died in 2013, meaning Stacey was comingling estate funds with her own money during the relevant time period.

On June 24, 2015, Stacey transferred $350,000 from the 5255 account into an account ending in 8093. The 8093 account was a custodial savings account for a child of Stacey's former son-in-law. Finding No. 89 of the judgment explains the transaction occurred "one day before the end of the accounting period …. Yet this transfer was not included in the accounting. [Stacey] also did it one day before the Special Administrator was to take possession of the assets of the estate. It was not until Mr. Kelley reported the

13.

transfer in his testimony [citation], that the Court became aware of this. [Stacey] finally testified about it later when she took the stand."

Finding No. 89 continues:

"[Stacey] tried to disguise her actions from scrutiny by [transferring the] $350,000 into an account set up for the benefit of a minor, and then closing the account the next day by taking out the $350,000 in the form of cashier's checks [naming her as the payee]. Although [Stacey] claimed the money was 'hers' from the income from her almond ranch, her attempt to prove this failed because she did not supply any backup to document the claimed expenses. Thus, [Stacey] failed to show that this money did not come from the income on the Snelling Ranch. The Court concludes that [Stacey] deliberately tried to conceal this transaction from being discovered by the Court, and hid the money so the Special Administrator would not seize the money."

Finding No. 90 explains "[Stacey] paid $50,000 of this money back to the estate" but "claimed it was a loan to the estate." The trial court found otherwise, concluding it was "a partial return of money wrongfully taken." Stacey was surcharged for the outstanding $300,000.

The factual dispute was over what amounts in the 5255 account constituted income from the Snelling Ranch and what amounts were proceeds from Stacey's own farming operation in Denair. Stacey created and submitted a one-page spreadsheet purporting to summarize the profits and losses of her Denair ranch for the years 2008–2015. She also provided two sets of QuickBooks reports and some bank records verifying income from her ranch.

As explained in the statement of decision, "although the revenue she received from the operation of her ranch was corroborated by processer records, there was no independent third-party records which supported her claimed expenses, including the allocation of the great majority of them to the Snelling Ranch. The only thing she offered were her Quick Books [*sic*] reports, which could be easily changed by her." (Punctuation omitted.) Accordingly, the trial court found Stacey "failed to provide any documentary proof backing up her Quick Book [*sic*] entries showing the allocation of the expenses

14.

between her Denair Ranch and the Snelling Ranch" and concluded "her claim that the $350,000 was 'her money' has not been proven. The Court [assumes] the money came from the Snelling Ranch, belonged to Lonni, and as such, was improperly taken by [Stacey]."

Stacey admitted it is possible to manipulate the data in QuickBooks reports. In the absence of independent corroborating evidence, the trial court was not required to accept the self-generated documents as conclusive proof of her entitlement to the $350,000. (Cf. *Kenna Trading*, *LLC v. Commissioner* (2014) 143 T.C. 322, 367 [U.S. Tax Court opinion ruling "Quickbooks entries alone are insufficient to prove" a petitioner's assertions]; *Olive v. Commissioner* (2012) 139 T.C. 19, 32–33 [court not required to accept as true general ledgers that were neither "independently prepared nor bore sufficient indicia of reliability or trustworthiness"].) Moreover, as we explained in *Ashlock I*, a trier of fact may reject even the uncontradicted testimony of a witness so long as the rejection is not arbitrary. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 368.)

Stacey contends "[t]he trial court's finding that [she] did not support the correctness of her accounting is belied by the fact that … nine boxes of supporting documentation were sitting in the courtroom." She refers to these boxes no less than 10 times in her opening brief and even includes a *photograph* of the boxes in her appendix. Yet the contents of the boxes were neither introduced into evidence nor made part of the record on appeal. "Where exhibits are missing we will not presume they would undermine the judgment." (*Western Aggregates*, *Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291; see *ibid.* ["[Appellant's] brief leaves the reader mystified as to what was introduced at trial and why critical evidence was not"].)

The $300,000 surcharge came down to a credibility determination, and the trial court did not believe Stacey. She was found to have falsified records in the past and had given false testimony on other topics. Her behavior in connection with the sham

15.

partnerships was deemed fraudulent. Given those determinations, and in light of the suspicious circumstances under which the transactions occurred, Stacey has not shown the evidence offered to prove her entitlement to the money was "'of such a character and weight as to leave no room for a judicial determination that it was insufficient.'" (*Shaw*, *supra*, 170 Cal.App.4th at p. 279.)

### 2. Surcharge of $100,000

The second surcharge was based on Stacey's "handling of a check for $100,000." Check No. 2000, dated January 12, 2008, was drawn on Lonnie's bank account at Bank of America ending in 3157. The check was made out to "Cash" and signed by Stacey. The memo line allegedly reads, "To ranch account," but the copy in the record on appeal is illegible. Apparently, Stacey was an authorized signer on the account and is the person who handwrote the date of "1/12/08."

Stacey claims to have mistakenly omitted a "1" when dating the check. In other words, she alleges the check was actually written on November 12, 2008. In support of this contention, she produced photocopies of checks Nos. 2001–2004 from the same account, which appeared to be dated between December 10 and 30, 2008.

Stacey alleged the $100,000 check was immediately deposited into an account at Bank of the West ending in 8112, which was held under the name "Lonnie Ashlock dba Ashlock Ranches." She produced a bank statement from the 8112 account that confirmed a $100,000 deposit on November 12, 2008, as well as QuickBooks reports indicating the same amount of money had been received as "crop income" two days earlier. However, Stacey failed to verify the source of the November 2008 deposit with independent documentation. She did not produce a cancelled check or bank records from the 3157 account to confirm the $100,000 check dated January 12, 2008, and written to "Cash" was in fact deposited into the 8112 account on November 12, 2008.

16.

Gabriel's expert opined there was "not enough proof" for him to conclude the November 2008 deposit into account 8112 was made with the $100,000 check written from account 3157. He testified:

> "[T]he date is obviously an issue. [¶] The other issue I have is why was the Bank of America account not in the court accounting? If we had an account at Bank of America for which we're drawing checks on that account payable to cash, and they're being deposited into various other bank accounts, the transactions are within the court accounting period, [so] I don't know why the B of A account was omitted from the court accounting [and] why there's no mention of this particular bank account until we found some checks written to cash that showed that it was drawn on a Bank of America account."

The trial court found the $100,000 check was written on January 12, 2008. It also found Stacey had failed to properly account for it, and the court did not accept "the explanation that the same $100,000 was deposited ten months later" into account 8112. (Punctuation omitted.)

Again, the issue on appeal is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*Shaw*, *supra*, 170 Cal.App.4th at p. 279.) Stacey's accounting of the $100,000 is not "'uncontradicted'" (*ibid.*) because, contrary to her bookkeeping records, the check is dated January 12, 2008. Likewise, her supporting evidence is not "'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Ibid*.) A different finder of fact might have ruled in her favor based on the circumstantial evidence, but we are not in a position to "judge the credibility of witnesses or to reweigh the evidence." (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.) Therefore, reversible error has not been shown.

### 3. Surcharge of $27,624.20

The third surcharge is extremely confusing and must be reversed, in part, subject to recalculation on remand. The trial court actually combined the second and third surcharges together, declaring the total amount to be $127,624.20. Gabriel generally concedes the $27,624.20 figure does not match the trial court's stated rationale.

17.

The statement of decision explains how the trial court scrutinized a request by Gabriel for surcharges of $723,919.63, "including $631,920.63 [taken from] bank accounts." After "carefully consider[ing] all the evidence," the trial court found only "two bank expenditures or withdrawals that [were] <u>not</u> properly accounted for." (Original emphasis.) One was the $100,000 check written from the Bank of America account ending in 3157. The other was not a single expenditure or withdrawal but rather a series of transactions involving an account at Bank of the West ending in 6905. This had been Lonnie's "personal account," but his sister and Stacey were reportedly added as authorized signers in 2011.

At page 16 of the statement of decision, the trial court declares:

"The amount in [account 6905] at the end of October, 2013 (the month that Lonni Ashlock died) was $29,649.62. The balance in that account had grown to $35,248.62 by March 13, 2014. Thereafter, [Stacey] made 4 wire transfers out of that account, leaving only $102.62 in the account. The transfers were all made into [her account at Bank of the West ending in 0371]. *The total amount transferred, and unaccounted for, is the sum of $35,146.*" (Italics added.)

There were only four wire transfers during the cited time period, all occurring on March 17, 2014, and the total amount transferred was $16,608.85. The trial court undoubtedly arrived at $35,146 by subtracting the ending balance of $102.62 from the earlier balance of $35,248.62. However, the financial activity during that period included other debits totaling $18,537.50 *and* a credit of $0.35 for earned interest.

According to Stacey's ledger for account 6905, the additional debits of $18,537.50 consisted of a $10,007.50 payment to the Internal Revenue Service (IRS); a payment of $4,507.50 to the Crabtree Schmidt law firm; a payment of $4,007.50 to attorney Ronald Sarhad, and a bank service fee of $15.

In her objections to the statement of decision, Stacey argued her expenditures were justified. Strangely, she cited figures different from those previously used by the trial court. Assuming the trial court intended to surcharge her for all payments made to her

18.

attorneys, Stacey noted she had also paid $5,000 to Crabtree Schmidt on February 5, 2014, and $2,500 to Ronald Sarhad on March 10, 2014. That information was accurate, but she proceeded to miscalculate the total debits and asserted the correct amount was "$37,646.70, not $35,146.00 as stated by the court."[4]

Unfortunately, the trial court adopted Stacey's erroneous calculation while partially sustaining her objection. The minute order states: "After further consideration, the Court will deduct $10,022.50 from [Stacey's] figure of $37,646.70, leaving a balance of $27,624.20." In essence, the trial court acknowledged the propriety of the $10,007.50 IRS payment and $15 service fee but not the payments to her lawyers.

We are confronted with two issues. First, did the trial court err by finding Stacey failed to account for the wire transfers of $16,608.85? Second, was any amount of the $11,015.35 surcharge balance permissibly imposed?

Regarding the wire transfers, the evidence shows Stacey took $16,608.85 of Lonnie's money and deposited it into her own bank account. Her self-generated records supposedly indicate the money was used for "legitimate business expenses." The forensic accountant, Christopher Kelley, was unable to trace this money.

Stacey again claims "[a]ll third-party supporting documents were included in the nine boxes presented to the court." However, her trial counsel asked Mr. Kelley about those boxes. He testified, "I did go through the boxes." When questioned about a box marked "Bank statements," Mr. Kelley replied, "All the bank statements that were in that box had to do with Bank of the West." Stacey's claim would fail even without this testimony, but it shows there was conflicting evidence in terms of whether the boxes contained third-party documents supportive of her disputed accountings. Reversible error has not been shown. (See *Bookout*, *supra*, 186 Cal.App.4th at p. 1486; *Shaw*, *supra*, 170 Cal.App.4th at p. 279.)

[4]The correct figure would have been $42,646.35 (attorney payments of $16,015 + IRS payment of $10,007.50 + $15 service fee + wire transfers of $16,608.85).

19.

As for the second issue, Gabriel asks us to modify the judgment by reducing the surcharge to $25,123.50. His proposal is to uphold only the amounts of $16,608.85 for the wire transfers and $8,515 in payments made to Stacey's lawyers on March 17, 2014, plus give Stacey credit for the $0.35 in earned interest. We decline Gabriel's request for the following reasons.

The trial court focused on the wire transfers and appears to have initially been mistaken as to the total amount of those transactions, all of which occurred on March 17, 2014. Stacey's objection highlighted the fact that its original calculation of $35,146 included a $15 bank service fee and other expenditures made on the same date: $10,007.50 to the IRS and $8,515 to her legal counsel. She also noted an additional $7,500 in payments to the same attorneys, which the trial court had evidently overlooked.

Stacey's ledger uses the words "Estate Defense" to explain both payments to Crabtree Schmidt. The words "Walls vs Ashlock defense" are used to explain both payments to attorney Ronald Sarhad. Each of those payments, not just the two on March 17, 2014, were disputed at trial. Stacey maintained the lawyers were working on matters in which the estate was somehow involved and needed legal representation. Gabriel's attorneys argued otherwise.

Stacey does not cite to any evidence supporting her position regarding the propriety of the payments to Crabtree Schmidt and Ronald Sarhad. Therefore, she has not carried her burden to demonstrate the evidence compelled a finding in her favor. (*Shaw*, *supra*, 170 Cal.App.4th at p. 279.) However, there is no rational explanation for why the trial court would have surcharged her for payments made to those lawyers on March 17, 2014, but not for payments made on March 10, 2014, and February 5, 2014, for services rendered in the same cases. We therefore decline to adopt Gabriel's proposed modification of the judgment. The trial court's initial figure of $35,146 did not include the two earlier transactions, but, as Gabriel acknowledges, the $27,624.20 surcharge impliedly *does* include the March 10, 2014, payment to attorney Sarhad.

20.

We conclude the trial court made mathematical errors when calculating the third surcharge. The error involving the interest credit of $0.35 is undisputed. A second error occurred with regard to the attorney payments, but it is unclear whether the trial court actually intended to impose a surcharge for those expenditures. If it found the payments unjustified, then the calculation is off by $5,000 for failure to include the payment to Crabtree Schmidt on February 5, 2014. If it found the payments were proper, the calculation is off by $8,515 due to the erroneous inclusion of the March 17, 2014, transactions. Rather than guess at the trial court's intentions, we remand the matter for further proceedings.

The surcharge of $27,624.20 is affirmed as to the amount of $16,608.85 for wire transfers made on March 17, 2014. The surcharge is reversed as to the remaining balance of $11,015.35, but the trial court may recalculate the surcharge by factoring in the $0.35 interest credit and all attorney payments made between February 5, 2014, and March 17, 2014. To be clear, the surcharge shall remain $16,608.85 if it was never the trial court's intention to include the attorney payments in its equation. However, if the trial court found those payments constituted the misappropriation of estate funds, the surcharge should be recalculated accordingly. If the trial court truly intended to surcharge Stacey for some of the attorney payments but not others, its reasoning should be clearly stated for the record (and in that scenario recalculation is still necessary to account for the interest credit). In any event, the corresponding penalty under section 859 must be recalculated to equal twice the amount of the misappropriated funds (see further discussion, *post*).

### 4. *Surcharge of $6,000*

When Stacey drafted the subsequently invalidated Ashlock Family 2013 Trust A, she designated as one of its beneficiaries a "loyal coworker" named Robert Reyes. This individual apparently runs a business called Robert Reyes Custom Farming and was paid to provide services at the Snelling Ranch.

On June 26, 2015, two days after Stacey's removal of $350,000 from the bank account ending in 5255, she used the same account to transfer $6,000 to Robert Reyes. Although this was done in a single wire transfer, Stacey's bookkeeping records discrepantly show two payments of $3,000 made one day prior to the actual transaction date. The parties disputed whether the payment was a legitimate expenditure on behalf of the estate or a gratuitous transfer of estate funds.

The trial court said, "[Stacey's testimony] made it clear this money was not for wages he had earned, but rather it was some type of incentive to stay on through harvest. Mr. Reyes never testified in trial, so we are left solely with the testimony of [Stacey]." For those reasons, it invoked the principle stated in Evidence Code section 412: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

The trial court expressly found Stacey's testimony to be untrustworthy. Thus, it "deemed [the transaction] to be an improper expenditure." On appeal, Stacey argues "[t]he harvest was accomplished by Robert Reyes. Therefore, the $6,000 was expended for the benefit of the Snelling Ranch." Even if the first assertion is true, Stacey testified Reyes would have quit but for the payment of $6,000, which seems to be the part the trial court did not believe. We defer to the trial court on issues of credibility, so there is no basis for reversal. (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.)

### 5. Surcharge of $40,000

In *Ashlock I*, the trial court found Stacey had wrongfully taken a gun collection to which the estate was entitled. She was ordered to return it or "its dollar value equivalent in cash," which was estimated to be $40,000. She neither returned the guns nor paid the estate their cash value, and so the trial court imposed a $40,000 surcharge.

In her opening and reply briefs, Stacey contends there is insufficient evidence of the estate's entitlement to the gun collection and/or its cash value. Gabriel argues these

challenges are untimely, and we agree. Stacey made the same assertions in posttrial briefing prior to her appeal of the *Ashlock I* judgment.

At page 51 of Stacey's opening brief in *Ashlock I* she argued, "The court's conclusion that the gun collection belongs to the estate ignores the fact that Lonni was convicted of a felony and could not legally own the gun collection and the testimony by Larry that Lonni gave the guns to [Stacey's son]." We noted the trial court had credited other witness testimony indicating Lonnie retained ownership of the guns but kept them locked away in Stacey's home for legal reasons. Despite having challenged the valuation of the gun collection in a motion for new trial, Stacey did not raise the issue in the *Ashlock I* appeal. Since the estate's entitlement to the gun collection and its cash value are matters encompassed in the *Ashlock I* judgment, the time to challenge those findings has passed.

## IV.   Sufficiency of the Evidence re:  Denial of Requested "Offsets"[*]

Stacey's opening brief alleges the trial court "failed to award funds owed to [her] as an offset." Gabriel puts the assertion in context by including in his Respondent's Appendix a copy of Stacey's objections to the statement of decision. Stacey's final "objection" stated:  "It is suggested that the following additional Findings be included in the Second Statement of Decision." She then listed 11 proposed findings concerning money and/or the value of services she allegedly contributed toward Lonnie's business ventures without reimbursement.

Gabriel has also provided the trial court's ruling on the "objection," which is set forth in a minute order:  "The Court finds that the proposed additional findings are not supported by the evidence, and declines to add them to the Second Statement of Decision."

---

[*]See footnote, *ante*, page 1.

23.

Stacey's offset claims are presented in two paragraphs of her opening brief. They are as follows:

"Stacey requested, but the trial court declined to rule on matters that would have provided on [*sic*] offset to any damages awarded. Stacey presented evidence of the amounts she was owed by the Estate, including her unpaid salary for Willow Bend, Tiger Creek Home, and Morningstar subdivisions of $105,721.55; her contribution toward the purchase of Portrero [*sic*] Way in LaGrange of $10,000.00 for which she was entitled to receive $19,625.89; her contribution of $74,000 toward the purchase of Walnut Avenue in Winton; her participation in the purchase of property at 21050 Shaw Flat Road, Jamestown resulting in her entitlement to $61,294.27 which she later used toward the acquisition of 805 Tully Road, ([*Ashlock I* Appellant's Opening Appendix,] Tab 151); the value of her services over the years in managing and selling properties as to what she believed she was a partner and as to which now she has received no compensation which could have amounted to $1,256,615.97 if she had not been Lonni's significant other, ([*Id.*] Tab 142); her claim of entitlement to 805 Tully Road, Modesto; her claim of entitlement to the proceeds from the sale of 1633 Arlington Court, Turlock ([*Id.*,] Tab 152); and her claim of the $143,391.04 balance owing on the Denair Ranch accounting. (Tab 146.)

"The failure to rule on or apply as on [*sic*] offset these amounts is reversible error because had the offsets been applied, they would have consumed the damages awarded to Gabriel (besides the double value of the properties). This failure by the trial court was, therefore, especially prejudicial to Stacey."

Stacey's "Tab" citations require the reader to cross-reference her 4,622-page appendix in *Ashlock I* and review its index to find the material upon which she relies. "Tab 151" consists of six pages, including a self-generated "Income Expense" report for the Tully Road property; a copy of a partially redacted check from 2006 issued to Stacey by Yosemite Farm Credit, ACA, in the amount of $135,000; a 2006 mortgage statement addressed to "Melvin Jones Jr" regarding the Tully Road property, and two additional pages of bank records, the latter of which apparently show Stacey paid off the mortgage. "Tab 142" consists of 48 pages of assorted ledgers, title company statements, and other documents. "Tab 152" consists of a minute order and four pages of copies of checks pertaining in some way to the Arlington Court and Tudor Court properties. "Tab 146" is

24.

a one-page spreadsheet purporting to summarize the profits and losses of Stacey's almond ranch in Denair.

According to Gabriel, Stacey is asserting seven different claims. Gabriel's brief gives short shrift to six of them, accurately noting Stacey's failure to explain how the "Tab" citations support her position. Gabriel provides a substantive discussion of the Arlington Court issue and argues the seventh claim is meritless. Stacey's reply brief devotes 16 pages to the offset claims, offering new factual arguments with citations to trial testimony and other records. As previously explained, since Gabriel was deprived of the opportunity to refute points not raised in the opening brief, the new assertions are forfeited. (*Baptist v. Robinson*, *supra*, 143 Cal.App.4th at p. 171; *Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 764.)

"'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*.'" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) This means "*all* material evidence on the point must be set forth and not merely [appellant's] own evidence." (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255, italics added; accord, *Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at p. 881.) Stacey has done none of those things, and it is "neither practical nor appropriate for us to comb the record on [her] behalf." (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 888.)

Moreover, Stacey had the burden of proof at trial to establish her entitlement to any offsets. As the appellant, she must affirmatively demonstrate how the evidence compelled findings in her favor as a matter of law. (*Shaw*, *supra*, 170 Cal.App.4th at p. 279.) The offset issues were discussed on multiple days of trial and disputed by Gabriel. In briefing below, he argued Stacey's contentions were "laughable," "without substantiation, except in her own mind," and untimely because "she did not file any creditor's claims or comply with the relevant Probate Code provisions." For the reasons

25.

discussed, we conclude the undeveloped claims fall well short of establishing grounds for reversal.

## V. Liability Under Section 859

### A. Statutory Interpretation

Section 850 et seq. "provides a mechanism for court determination of rights in property claimed to belong to a decedent or another person." (*Estate of Young* (2008) 160 Cal.App.4th 62, 75.) Section 850 allows specified persons to file a petition to obtain such a determination. (*Id*., subd. (a).) Sections 851 through 855 provide most of the procedural rules.

If a petitioner establishes the right to property held by another party, the petitioner may recover the property under section 856. The statute provides: "[I]f the court is satisfied that a conveyance, transfer, or other order should be made, the court shall make an order authorizing and directing the personal representative or other fiduciary, or the person having title to or possession of the property, to execute a conveyance or transfer to the person entitled thereto, or granting other appropriate relief." An order granting relief under section 856 confers "the right to the possession of the property, and the right to hold the property, according to the terms of the order as if the property had been conveyed or transferred in accordance with the terms of the order." (§ 857, subd. (b).)

"'Section 856 clearly and unambiguously grants the probate court the power not only to order a conveyance or transfer to the person entitled to the property in question, but also to *grant other appropriate relief*.'" (*Estate of Kraus* (2010) 184 Cal.App.4th 103, 113–114.) A petitioner may recover property under section 856 and seek additional relief under section 859. (*Estate of Young*, *supra*, 160 Cal.App.4th at p. 89.) Section 859 states, in relevant part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of [the subject] property…, the person shall be liable for twice the value of the property recovered by an action under this part. … The remedies provided in this section shall be in addition to any other remedies

26.

available in law to a person authorized to bring an action pursuant to this part." (*Ibid.*)

Stacey claims the trial court misconstrued the phrase "twice the value of the property recovered" as used in section 859. According to her, this language establishes the maximum amount of recoverable "damages" under section 850 et seq. Put differently, she argues a petitioner cannot recover misappropriated property under section 856 and also be awarded twice the value of the recovered property under section 859. We apply de novo review to this issue of statutory interpretation. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.)

"Our task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.) If the words are clear and unambiguous, their plain meaning governs. (*Ibid.*; accord, *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.) "[W]e have no power to rewrite the statute to make it conform to a presumed intention that is not expressed." (*County of Santa Clara v. Perry* (1998) 18 Cal.4th 435, 446.)

The following hypothetical scenario illustrates how section 859 operates under the plain language of the statute. Assume a petitioner's action under section 850 et seq. alleges the misappropriation of a diamond ring valued at $10,000. The probate court finds the petitioner is entitled to the ring and, pursuant to section 856, orders that it be returned. The petitioner is then deemed to have "recovered" the property for purposes of section 859—even if the actual conveyance has yet to occur. (See § 857, subd. (b).) If the petitioner can show the opposing party acted in bad faith, the probate court must impose a penalty under section 859 because the statute says "the person shall be liable for twice the value of the property recovered." (*Ibid.*) Consequently, the opposing party must return the ring *and* pay $20,000.

Section 859 also applies to real property. (See, e.g., *Estate of Young*, *supra*, 160 Cal.App.4th at p. 92.) Suppose a petitioner seeks to recover title to residential real estate valued at $100,000. If he prevails, the trial court will order the necessary reconveyance of title. If the opposing party acted in bad faith when transferring title to herself, she will be liable for $200,000. That is what happened in this case, but the 18 properties recovered by the estate were collectively valued at $5,148,000. Stacey was held liable for $10,296,000, i.e., "twice the value of the property recovered." (§ 859.)

The statutory language is no less clear when the wrongfully taken property is cash, but confusion may arise due to the tendency of practitioners and courts to informally refer to section 859 as a "double damages" provision. (E.g., *Hill v. Superior Court* (2016) 244 Cal.App.4th 1281, 1283–1284.) We used the phrase ourselves in *Ashlock I*. However, the word "damages" does not appear anywhere in the statutory scheme. (§§ 850–859.)

Changing our first hypothetical scenario, assume that instead of a diamond ring, the petitioner seeks to recover $10,000. The money was withdrawn from the decedent's bank account by the opposing party. The probate court determines the decedent's estate is entitled to the $10,000 and, pursuant to section 856, orders the opposing party to return it. The opposing party is additionally found to have acted in bad faith. Pursuant to section 859, the opposing party "shall be liable for twice the value of the property recovered," i.e., $20,000. When the judgment is entered, it reflects a total monetary obligation of $30,000, but $10,000 of that sum is the "recovered" amount. The obligation to return the money arises under section 856; the liability under section 859 is a punishment for culpable misconduct.

Stacey disagrees with the above analysis. Her briefing states:

"By way of a hypothetical, and using small numbers for ease of calculation[,] suppose Stacey took $5 from the estate. Under [section] 859, the damage is the $5 taken, which is then doubled, for a total judgment of $10. Stacey would owe the estate twice what she took i.e., $10. This is [the] most she would owe. [¶] … Here, what the trial court did, was

28.

essentially enter a judgment for $15, because it gave the estate the property and also twice the value of the property."

Stacey relies on *Conservatorship of Ribal* (2019) 31 Cal.App.5th 519 (*Ribal*), which does support her argument. In that case, Division Three of the Fourth District Court of Appeal interpreted section 859 as setting a limit on a wrongdoer's monetary responsibility under section 850 et seq. However, *Ribal*'s analysis does not follow the plain meaning rule and conflicts with the holding of *Estate of Kraus*, *supra*, 184 Cal.App.4th 103 (*Kraus*). Despite citing and quoting *Kraus*, the *Ribal* opinion does not acknowledge the conflict. (*Ribal*, at p. 525.)

In *Ribal*, the petitioner in an action brought under section 850 et seq. obtained a judgment against Nguyen. (*Ribal*, *supra*, 31 Cal.App.5th at pp. 521–522.) The judgment included a separate award for personal injury damages not relevant to our discussion. Part of the appeal dealt with ambiguous language in the judgment. Although couched in different terms, the opinion indicates the judgment provided for a net recovery of $79,991 under section 856. (*Ribal*, at pp. 522–524.) Nguyen was also found liable under section 859, and twice the value of the property recovered equaled $159,982.

The *Ribal* petitioner calculated "'the principal amount owing on the Judgment by separately including "Compensatory Damages" of $79,991 … and "Double Damages" of $159,982 …. By contrast, Nguyen argued the "Double Damages" […] subsumed the "Compensatory Damages."'" (*Ribal*, *supra*, 31 Cal.App.5th at p. 523, ellipses in original except where bracketed.) Adopting similar terminology, the appellate panel explained, "The stated amount of actual damages awarded in the judgment is $79,991. Double that amount is $159,982. Treble that amount is $239,973—which, when added to the [personal injury damages], reflects [the sum the petitioner] argues is the correct amount of the judgment." (*Id*. at p. 524.)

The *Ribal* court accepted Nguyen's interpretation of section 859, i.e., the argument that his obligation to return the $79,991 merged with his liability for "twice the value of the property recovered." The opinion concludes:

29.

"If the Legislature had intended damages to be tripled, it would have written something akin to 'the person shall be liable for [*three times*] the value of the property recovered by an action under this part.' (Prob. Code, § 859.) In our experience, the Legislature knows how to distinguish between double damages and treble damages and has provided for each in numerous contexts." (*Ribal*, *supra*, 31 Cal.App.5th at p. 525, brackets in original.)

Division Five of the Second District Court of Appeal has interpreted the statute differently. In its view, "Section 850 et seq. does not contemplate an *award* of *damages* to anyone." (*Kraus*, *supra*, 184 Cal.App.4th at p. 117.) "The statutory scheme's purpose is to effect a conveyance or transfer of property belonging to a decedent or a trust or another person under specified circumstances, to grant any appropriate relief to carry out the decedent's intent, and to prevent looting of decedent's estates." (*Ibid.*) When a probate court orders relief under sections 856 and 859, it is requiring the person in possession of the subject property to return it and the person who is culpable for misappropriating it to pay a statutory penalty. (*Id.* at p. 118.)

In *Kraus*, appellant David Kraus had withdrawn $197,402 from his dying sister's bank accounts under the ostensible authority of a void power of attorney. (*Kraus*, *supra*, 184 Cal.App.4th at pp. 106–107.) The beneficiaries of his sister's will and trust petitioned for relief under section 850 et seq. The probate court found David had acted in bad faith and ordered him "to return $197,402 to a court-appointed representative of the estate… and to pay statutory double damages of $394,804," which represented twice the value of the property recovered in the action. (*Kraus*, at p. 106.) The judgment was affirmed on appeal. Although it disapproved of the terminology, the appellate court concluded the result was permissible even if the $197,402 was construed as "compensatory damages." (*Id.* at p. 118.) Due to the finding of bad faith, David was separately liable under section 859 for the "statutory penalty" of $394,804. (*Kraus*, at p. 118.)

Several considerations lead us to conclude the proper interpretation of section 859 is reflected in *Kraus* and not *Ribal*. Unlike section 856, section 859 is punitive in nature.

(*Estate of Young*, *supra*, 160 Cal.App.4th at p. 88.) Section 859 does not impose punitive damages, but it is designed to punish and deter specific misconduct. (*Estate of Young*, at p. 88; accord, *Kerley v. Weber* (2018) 27 Cal.App.5th 1187, 1198, citing *ibid.* ["the purpose of section 859 [is] to punish and deter the wrongdoer"]; *Hill v. Superior Court*, *supra*, 244 Cal.App.4th at p. 1287 [concluding § 859 imposes liability for "statutory damages awarded as a penalty," which differ from punitive damages].)

There is nothing punitive about requiring a thief to return stolen property to its rightful owner, which undermines *Ribal*'s conclusion that a penalty imposed under section 859 subsumes the wrongdoer's obligation under section 856 to return the misappropriated property. (*Ribal*, *supra*, 31 Cal.App.5th at p. 525; cf. *Kerley v. Weber*, *supra*, 27 Cal.App.5th at p. 1198 [repayment of stolen funds pursuant to a criminal restitution order does not reduce a wrongdoer's liability under § 859 for the same misconduct].) Furthermore, the statutory language treats the duty to return the property as a separate and antecedent obligation: "the person shall be liable for twice the value of the property *recovered* by an action under this part." (Italics added.) Even cases construing the statute as a damages provision recognize that a recovery order under section 856 is a prerequisite for additional relief under section 859. (E.g., *Estate of Young*, *supra*, 160 Cal.App.4th at pp. 88–89.) If the Legislature had intended to merge the restorative obligation with the punitive penalty, inclusion of the word "recovered" would serve no purpose. "A construction making some words surplusage is to be avoided." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)

Applying the *Ribal* holding to our first hypothetical scenario illustrates its deviation from the plain language of section 859. Upon establishing ownership of the diamond ring, the petitioner is entitled to recover the property under section 856. The opposing party must return it regardless of whether the underlying circumstances involved bad faith or an innocent misunderstanding. The ring is worth $10,000, but the

31.

opposing party suffers no punishment or detriment by returning it to its rightful owner. However, if the person is found to have acted in bad faith, she is "liable for twice the value of the property recovered." (§ 859.) Twice the value of the property is $20,000, but *Ribal* holds the wrongdoer need only pay $10,000. (*Ribal*, *supra*, 31 Cal.App.5th at p. 525.) Under such a construction, the penalty is only the value of the property recovered, not "twice the value" as the statute demands.

In this case, the estate recovered cash, personal property, and real property. Stacey was found to have wrongfully taken the property in bad faith. The trial court specifically relied on *Kraus* to calculate her liability under section 859. We agree with the analysis of *Kraus* and thus reject Stacey's statutory interpretation claim.

## B.    Sufficiency of the Evidence[*]

Section 859 punishes "three different categories of conduct," any of which may serve as the basis for liability thereunder. (*Kerley v. Weber*, *supra*, 27 Cal.App.5th at p. 1197.) Prohibited acts include "(1) taking property in bad faith; (2) taking property by the use of undue influence in bad faith; and (3) taking property through [the commission of financial abuse of a dependent adult] as defined in Welfare and Institutions Code section 15610.30." (*Id*. at p. 1198.) Stacey denies engaging in such behavior. We interpret her arguments as challenging the sufficiency of the evidence.

It is Stacey's burden to affirmatively demonstrate any insufficiency of the evidence. (*Chicago Title Ins. Co. v. AMZ Ins. Services*, *Inc*. (2010) 188 Cal.App.4th 401, 415.) "Under the deferential substantial evidence standard of review, findings of fact are liberally construed to support the judgment … and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Powell v. Tagami* (2018) 26 Cal.App.5th 219, 231.) This is "generally considered the most difficult standard of review to meet, as it should be, because it is not

---

[*]See footnote, *ante*, page 1.

32.

the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Stacey begins by insisting she did not commit financial abuse of a dependent adult. In *Ashlock I*, we affirmed the trial court's opposite finding, which was made as to "the properties that were part of the 1993 Trust," i.e., two of the 18 properties Stacey had transferred into the invalidated 2013 trusts. The trial court found her "liable for two times the value of [those] assets." The law of the case precludes her from challenging those findings again in this appeal. (*Wells v. Lloyd*, *supra*, 21 Cal.2d at pp. 454–455.)

Next, Stacey inexplicably contends the trial court did not make any findings of bad faith. We quote the statement of decision, which is incorporated by reference into the judgment:

> "The Court finds that [Stacey] did exercise bad faith in wrongfully taking property belonging to Lonni Ashlock. At the time she did it, she exercised fraud by cutting and pasting Lonni's signatures to the phony 'partnership' papers. As stated in [*Ashlock I*], the partnerships were not valid…. Later, she decided to finalize her conversion of his assets by creating the 2013 trusts. During the interim, she began commingling the revenues from the Snelling Ranch in Account 5255. The Court finds that her transfer of the $350,000, and the wiring of the $6,000, out of account 5255 were acts demonstrating bad faith."

In her reply brief, Stacey seems to impliedly argue the trial court made contrary findings on the issue of bad faith in *Ashlock I*. Despite her erroneous record citations and confusing statements, we believe she is relying on this excerpt from the *Ashlock I* statement of decision: "the Court does not find [Stacey] guilty of elder financial abuse *as to the properties she had previously transferred to the 'partnerships'*. She is therefore not liable for exemplary damages and attorney fees as to those properties." (Original italics.) However, the quoted statement must be read in context; it is part of an analysis regarding Stacey's alleged acts of financial abuse within the meaning of Welfare and Institutions Code section 15610.30, and such acts fall within one of three categories of conduct punishable under section 859.

33.

The judgment is presumed correct, all reasonable inferences are indulged to support it, and all ambiguities are resolved in favor of its affirmance. (*Winograd v. American Broadcasting Co*. (1998) 68 Cal.App.4th 624, 631.) Consistent with the finding of bad faith in the current judgment, the *Ashlock I* judgment includes a finding Stacey committed "fraud in the setting up of the 'partnerships.'" As discussed herein and in *Ashlock I*, virtually every instance of misappropriation traces back to the fraudulent partnership scheme. Insofar as Stacey suggests the trial court previously found she did *not* act in bad faith, we reject the argument as unfounded.

Stacey's remaining arguments concern her "Advice of Counsel defense," which was also addressed in *Ashlock I*. The trial court found she was "not entitled to use" that defense, and we upheld its conclusion. Stacey could conceivably argue that *Ashlock I* only considered the defense vis-à-vis the allegations of financial abuse of a dependent adult. However, the defense would fail under a bad faith analysis for the same reasons.

Assuming, without deciding, that reliance on advice of counsel is a defense available outside the context of malicious prosecution and insurance bad faith litigation, the defense requires "[g]ood faith reliance on the advice of counsel, after truthful disclosure of all the relevant facts." (*Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1544.) "However, if the initiator acts in bad faith or withholds from counsel facts he knew or should have known would defeat a cause of action otherwise appearing from the information supplied, that defense fails." (*Bertero v. National General Corp*. (1974) 13 Cal.3d 43, 53–54.) In *Ashlock I*, the trial court found it "highly doubtful that [Stacey] disclosed to counsel that she had [forged and fabricated the partnership agreements]. Even if she had, the advice of any attorney to proceed with the trusts could not be considered given in 'good faith.'"

Stacey argues, "[r]egardless of her consultation of attorneys, she was proceeding on her belief that she was a partner with Lonni and owned a one-half interest in the subject properties." Her subjective beliefs were, of course, an issue of fact for the trial

court to determine and one ultimately based on its assessment of her credibility.  (See *Doe v. Regents of the University of California* (2016) 5 Cal.App.5th 1055, 1074 ["Credibility is an issue of fact for the finder of fact to resolve"]; *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 ["*Good faith*, or its absence, involves a factual inquiry into the [person's] subjective state of mind"].)  "Appellate courts 'do not reweigh evidence or reassess the credibility of witnesses.'"  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.)

Section 859 does not define "bad faith."  In other contexts, "[b]ad faith involves a subjective determination of [a] party's state of mind—specifically, whether he or she acted with an improper purpose."  (*Powell v. Tagami*, *supra*, 26 Cal.App.5th at p. 234.)  Black's Law Dictionary defines "bad faith" as "[d]ishonesty of belief, purpose, or motive."  (Black's Law Dict. (11th ed. 2019) p. 171, col. 2.)  It is the opposite of "good faith," which is defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage."  (*Id*., p. 836, col. 2.)

In *Ashlock I*, we affirmed the trial court's findings regarding the invalidity of the alleged partnerships.  The issue now before us boils down to whether Stacey, in taking estate property under the supposed aegis of partnership authority, believed in the existence and legitimacy of the partnerships.  The trial court necessarily found she did not, and its finding was not arbitrary.  (See *Beck Development Co. v. Southern Pacific Transportation* Co. (1996) 44 Cal.App.4th 1160, 1204 ["so long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted"].)  As set forth in *Ashlock I* and incorporated herein by reference, there was substantial evidence Stacey used artifice and forgery to create documents purporting to show the existence of the alleged partnerships.  There are other examples of evidence supporting the findings of bad faith, but we need

35.

not provide another exhaustive summary. Stacey's challenge to the sufficiency of the evidence fails to establish grounds for reversal.

## VI. Corrections to the Judgment[*]

In summary, we affirm the judgment in all material respects except for the surcharge of $27,624.20 related to funds spent or otherwise withdrawn from the Bank of the West account ending in 6905 (the third surcharge). The third surcharge is affirmed as to the amount of $16,608.85 but reversed as to the remaining balance of $11,015.35. The reversal is subject to recalculation on remand within the guidelines of this opinion. This disposition requires the trial court to recalculate Stacey's corresponding liability under section 859 and necessitates the following corrections to the judgment.

The figure of $35,146 is ordered stricken from "Finding[] of Fact" No. 95 on page 7 of the judgment; it shall be corrected on remand with whatever figure is consistent with the trial court's recalculation of the third surcharge.

The figure of $127,624.20 is ordered stricken from "Conclusion[] of Law" No. 29 on page 10 of the judgment; it shall be corrected on remand to reflect the sum of $100,000 plus the recalculated amount of the third surcharge.

The figure of $1,677,554.20 is ordered stricken from "Conclusion[] of Law" No. 31 on page 10 of the judgment; it shall be corrected on remand to reflect the sum of $1,622,305.84 plus twice the amount of the recalculated third surcharge.[5]

The figure of $1,692,597.84 is ordered stricken from subdivision (5) of item/paragraph "C" on page 11 of the judgment. If this sum was intended to reflect Stacey's total liability under section 859 for twice the amount of all combined surcharges,

[*]See footnote, *ante*, page 1.

[5]The total surcharges from *Ashlock I* are $365,152.92 ($358,223.60 + $6,929.32). Pursuant to section 859, Stacey is liable for twice that amount ($730,305.84). Not including the third surcharge, the total surcharges in this appeal are $446,000 ($300,000 + $100,000 + $40,000 + $6,000), and, pursuant to section 859, Stacey is liable for twice that amount ($892,000). Thus, $730,305.84 + $892,000 = $1,622,305.84.

36.

then the correct figure—when revised to account for the recalculated third surcharge—should be stated as a separate line item or paragraph to avoid any confusion.[6]

**DISPOSITION**

The surcharge of $27,624.20 is affirmed as to the amount of $16,608.85 but reversed as to the remaining balance of $11,015.35, subject to recalculation by the trial court. The penalty of $1,677,554.20, which was imposed pursuant to section 859 in relation to the surcharges, is affirmed as to the amount of $1,655,523.50 but reversed as to the remaining balance of $22,030.70 ($11,015.35 × 2), subject to recalculation by the trial court. In all other respects, the judgment is affirmed.

The matter is remanded for further proceedings consistent with this opinion. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____
PEÑA, J.

WE CONCUR:

_____
DETJEN, Acting P.J.

_____
SMITH, J.

---

[6]In her briefing, Stacey alleges it is "a complete mystery where item 5, $1,692,597.84, came from or what it represents." Gabriel persuasively argues this figure reflects a miscalculation of twice the amount of the combined surcharges in this case and *Ashlock I*. He theorizes the trial court mistakenly used the original third surcharge of $35,146, which appears in the unmodified March 19, 2018, statement of decision, instead of the revised sum of $27,624.20 in the July 13, 2018, minute order. In other words, $365,152.92 [*Ashlock I* surcharges] + $300,000 + $100,000, + $40,000 + $35,146 + $6,000 = $846,298.92 × 2 = $1,692,597.84. Whatever the explanation, the number is wrong and needs to be deleted.